[No. G027132. Fourth Dist., Div. Three. Aug. 2, 2000.]

KATHERYN S., Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
ORANGE COUNTY SOCIAL SERVICES AGENCY et al., Real Parties
in Interest.

Carl C. Holmes, Public Defender, Marri Derby and Paul T. DeQuattro, Deputy Public Defenders, for Petitioner.

No appearance for Respondent.

Laurence M. Watson, County Counsel, and Jim Persinger, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

Harold F. LaFlamme and Linda M. O'Neill, under appointments by the Court of Appeal, for Real Party in Interest Norma M.

OPINION

**BEDSWORTH, J.—**

INTRODUCTION

Katheryn S. is the mother of Norma M., who was born in the latter part of 1990. In September 1996—after the juvenile court had sustained a petition

filed under Welfare and Institutions Code[1] section 300, subdivision (d),[2] and Norma had been released into her mother's care under a conditional release to intensive supervision program (CRISP) agreement—Katheryn absconded with her daughter. The two remained in hiding outside of California for more than three years, after which time Katheryn was arrested on a warrant for child abduction and jailed in Spokane, Washington. Norma was immediately returned to officials in Orange County, but Katheryn was not brought before an Orange County Superior Court judge until about five months later.

In 1996, when dependency proceedings were commenced, the public defender was appointed to represent Katheryn; however, in June 1998, counsel was relieved by the court under *Janet O. v. Superior Court* (1996) 42 Cal.App.4th 1058 [50 Cal.Rptr.2d 57], based upon her failure to participate in the proceedings. Seven months later, and while the whereabouts of Katheryn and Norma were still unknown, the court ordered reunification services provided. Six months thereafter, on June 4, 1999, the court ordered those "services" terminated and scheduled a permanency hearing under section 366.26.[3] Because Katheryn was absent from the proceedings and no longer had counsel to represent her, no notice of intent to file a petition for writ relief pursuant to section 366.26, subdivision (*l*) and California Rules of Court, rule 39.1B was filed in response.[4]

On December 10, 1999, though the court knew Katheryn was in custody in Spokane, Washington, as a result of the court's own warrant, a hearing

---

[1]All subsequent statutory references are to this code unless otherwise specified.

[2]Section 300 provides, "Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court . . . : [¶] . . . [¶] (d) The child has been sexually abused, or there is substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by his or her parent or guardian or a member of his or her household, or the parent or guardian has failed to adequately protect the child from sexual abuse when the parent or guardian knew or reasonably should have known that the child was in danger of sexual abuse."

[3]A section 366.26 hearing is described in subdivision (b) of that section as a vehicle for obtaining "stable, permanent homes for [dependent] children." In addition to detailing the procedures to be followed at such hearings, section 366.26 sets forth the Legislature's order of preference for disposition of children declared dependents of the juvenile court: Subdivision (b) explains that the court can (1) terminate parental rights and place such children for adoption; (2) simply find that a termination of parental rights would not be detrimental to the child, identify adoption as the permanent placement goal, and set a hearing up to 180 days in the future to allow the public agency involved to conduct a search for an adoptive home (which is what the juvenile court has done here); (3) appoint a legal guardian and order that letters of guardianship issue; or (4) order that such children be placed in long-term foster care, subject to periodic review.

[4]Under California Rules of Court, rule 39.1B(f), such a notice must be filed within seven days of the court's order setting a hearing under section 366.26. Moreover, a party's failure to seek timely writ relief "shall preclude that party from obtaining subsequent review on appeal of the findings and orders made by a juvenile court in setting a hearing under section 366.26." (Cal. Rules of Court, rule 39.1B(e); § 366.26, subd. (*l*)(2).)

under section 366.26 was held in her absence, without any counsel present to represent her interests or position. At that hearing, the assigned social worker testified that she had not had time to assess the nature or quality of the parent-child relationship, had not spoken to Norma about the possibility of adoption and thought it would be inappropriate to do so, as the minor had spent the prior three years in her mother's care. Along with Norma's court-appointed attorney, she requested a continuance of the proceedings, but the court denied that request, concluding: (1) Norma is adoptable, though difficult to place; (2) Norma would suffer no detriment from the termination of parental rights; (3) the exceptions to such a termination set out in section 366.26, subdivision (c)(1)[5] do not apply; and (4) a hearing should be held pursuant to section 366.26, subdivision (c)(3)[6] to facilitate Norma's adoption.[7]

After Katheryn returned to California in April 2000, the public defender was reappointed to represent her. He immediately filed a notice of intent to file a writ under California Rules of Court, rule 39.1B to address the court's June 4, 1999 orders and subsequently filed the instant petition for a writ of mandate. In the petition, he complains that reunification services were a sham and that the court's orders terminating those nonexistent services and setting a hearing under section 366.26 should be invalidated because they were made while Katheryn, though constitutionally entitled to counsel, was not represented.

According to the public defender, the court's failure to ensure counsel was present to represent Katheryn's interests resulted in a denial of her right to due process of law. The petition before us therefore seeks extraordinary relief for Katheryn's failure to file timely notice of intent to seek writ relief under California Rules of Court, rule 39.1B after the court terminated reunification services and set a permanency hearing under section 366.26 on June 4, 1999. It further prays for relief from the orders made by the juvenile court on December 10, 1999.

We find that in the course of the proceedings: (1) the court erred in relieving the public defender under the auspices of *Janet O. v. Superior*

---

[5]Subdivision (c)(1) sets out four circumstances which can justify a finding that termination of parental rights would be detrimental to a dependent child. Of the four circumstances listed, the one at issue in this case is subdivision (c)(1)(A). It provides that a termination of parental rights should be avoided if "[t]he parents or guardians have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

[6]Essentially, subdivision (c)(3) provides that when the court finds that termination of parental rights would not be detrimental to a dependent child and that the child has a probability of adoption but would be difficult to place, the court can identify adoption as the permanent placement goal and give the public agency involved up to 180 days to search for an adoptive home.

[7]We emphasize that, as of the date we issue this opinion, the juvenile court has made no final order terminating parental rights.

*Court, supra,* 42 Cal.App.4th 1058; (2) the provision and termination of reunification services, and the June 4, 1999 order setting a hearing under section 366.26 were premature; (3) the court abused its discretion by denying the motion to continue the December 10, 1999 permanency hearing; (4) the court's orders and findings on that date were unsupported by any substantial evidence; (5) fundamental errors that occurred throughout the proceedings would likely have been averted or submitted for appellate review had Katheryn been represented by counsel; and (6) under the circumstances of the case, deprivation of legal representation was fundamentally unfair, and Katheryn was denied due process of law. We therefore issue a writ of habeas corpus to remedy the violation of her constitutional right to counsel, vacate the court's June and December 1999 orders and findings, and remand the matter for a new review hearing.

## Factual Background

On March 19, 1996, the Orange County Social Services Agency (SSA) detained Katheryn's five-year-old daughter, Norma, after receiving reports indicating she had been sexually molested by her mother's live-in boyfriend, Edwin D. (whom Norma referred to as "Daddy Ed"), and touched inappropriately by a boy of like age at her school.

When first interviewed by a police investigator, Norma said her Daddy Ed had touched her "private" and her "baby butt." After being quizzed on the importance of telling the truth, however, she said only the boy at school had done so. Although, after his investigation, the officer declined to press charges, SSA filed a petition under section 300, subdivision (d) alleging sexual abuse, and a hearing was held on the petition on March 22, 1996. Because Katheryn was indigent, the public defender was appointed to represent her, and independent counsel was appointed to represent her daughter.

A CRISP agreement was signed by Katheryn on May 3, 1996, and Norma was returned to her custody under supervision. On June 14, 1996, the assigned social worker reported that all was going well, and Katheryn was providing her daughter "good care" in a setting removed from her alleged molester. Four days later, Norma was declared a dependent child of the court pursuant to a stipulated disposition, though Katheryn—and the local police investigator who had interviewed Norma—continued to believe her boyfriend never abused her daughter.

On September 16, 1996, the social worker attempted to contact Katheryn again but found she and her daughter had left the area two weeks earlier *after being evicted from their residence.* Unable to locate them, SSA sought and obtained warrants for their arrest.

Throughout most of 1997, the whereabouts of mother and child remained unknown, and the six-month review hearing was repeatedly continued, with all previous orders still in effect. But in October of that year, SSA received word from an elementary school teacher in Easton, Pennsylvania, who was looking into Norma's background. She advised the case worker that Norma had been attending school intermittently, and she provided the location where Katheryn could be reached. No action was taken by SSA in response to this notification, other than an unsuccessful attempt to contact Katheryn by telephone, until the following January. By then, Katheryn and Norma had moved on.

On January 27, 1998, the court suggested that a supplemental petition be filed, and in June, such a petition was sustained, with custody of the minor vested in SSA pursuant to section 361, subdivision (c)(1).[8] Meanwhile, on May 6, 1998, a hearing was held at which the public defender was relieved pursuant to *Janet O. v. Superior Court, supra,* 42 Cal.App.4th 1058, due to Katheryn's lack of participation in the dependency proceedings.

On December 18, 1998, a reunification plan was proposed by SSA and adopted by the court in Katheryn's absence, and the case was continued to June 4, 1999, for a 12-month review. On June 4, though her whereabouts were unknown, the court ordered reunification services terminated and scheduled a hearing under section 366.26. By September 1999, mother and child were still missing, so a criminal complaint was filed, charging Katheryn with misdemeanor child abduction. (Pen. Code, § 278.5.)

On July 14 and October 4, 1999, the court ordered that notice of the section 366.26 hearing be made to Katheryn by publication. Then, on motion of the district attorney, the court ordered Katheryn's warrant upgraded to felony status to facilitate entry of Norma's name into the National Crime Information Center database of missing and abducted children. On November 5, that order paid off: Norma and Katheryn were located in Washington. Katheryn was jailed, and Norma was returned to Orange County the following day.

On November 12, 1999, the court ordered Norma detained in SSA's physical custody pending a permanency hearing. And on December 2, 1999,

[8]The record indicates the court decided to vest custody with SSA in order to permit the district attorney to file child abduction charges. Such an order is no longer necessary under the provisions of Penal Code section 277, subdivision (e). In defining "right to custody," that subdivision provides, "Whenever a public agency takes protective custody or jurisdiction of the care, custody, control, or conduct of a child by statutory authority or court order, that agency is a lawful custodian of the child and has a right to physical custody of the child. In any subsequent placement of the child, the public agency continues to be a lawful custodian with a right to physical custody of the child until the public agency's right of custody is terminated by an order of a court of competent jurisdiction or by operation of law."

SSA mailed Katheryn notice of hearing; however, she remained in custody in the State of Washington and did not respond. Then, on December 10, 1999—though Katheryn was absent and not represented by counsel—the trial judge began a hearing under section 366.26 to determine the appropriate disposition of the child.

When asked whether it would be detrimental to Norma were the court to terminate parental rights, the social worker responded, "That is a difficult question to answer because she's had contact with her mother for the last three years non stop. And we haven't had time enough to assess the attachment with her mother because we have only known where she's been . . . for the last month." The social worker did relate, however, that Norma missed her mother and had asked to see her.

When SSA's attorney inquired, "Do you have any information one way or the other about the quality of the relationship between the mother and the child when they were A.W.O.L.," the social worker answered, "No." And when counsel asked, "So, in other words, you have no idea if this relationship between the mother and the child was beneficial to the child?" again, she answered, "No." The minor's counsel also asked whether Norma had received a mental health evaluation since her return to Orange County, and the social worker replied, "We are currently evaluating her. . . . But [our evaluation is] not completed."

At the hearing, the judge also considered SSA reports that indicated that, during a substantial period of the time Katheryn was in hiding, she kept Norma out of school and failed to obtain care for her teeth and a previously diagnosed attention deficit and hyperactivity disorder. As a result, though Norma was nine years old, she could neither read nor write, and she had serious dental problems that required immediate attention. SSA opined that Norma would be difficult to place for adoption because she is "half black." Otherwise, she appeared to be well-adjusted, with no developmental delays, and smart enough to catch up in school. At the time of the hearing, she continued to ask to see her mother, she insisted she had not been molested during her absence from California, and the idea of adoption had never been broached with her.

As regards the subject of adoption, the social worker provided this testimony in response to questions from Norma's attorney: "Emotionally, I don't feel [Norma] is ready to even have the word adoption in her head and understand what it means. That's why I recommend the hearing be continued so that I would have time to . . . get her thinking about that. [¶] . . . [¶] . . . [W]e need more time to find an adoptive home. I don't want to

terminate parental rights and leave her an orphan when we don't have an adoptive home at this time, due to her special needs and the fact she is over seven. We . . . need more time. [¶] Emotionally, she is not ready to hear about adoption, being that she was just with her mother . . . . And that's part of being at a .26 hearing, is for me to ask her that. And I just feel I can't do that at this time."

After hearing this testimony, Norma's counsel moved the court for a continuance under section 352, urging, "I believe that the court should have all available evidence before it before making such an important decision." The motion was denied, so counsel made the following offer of proof: "We spoke with Norma on the tenth of November. At that time she told us that she liked living with her parents . . . ; that her parents didn't hurt her; that she didn't get in trouble; that she is not afraid of her parents; [and] that she would like to live with . . . [her] siblings . . . ." The court asked whether one of the siblings—Norma's brother Chucky—was a gang member, and counsel answered, "May very well be."

Faced with the court's refusal to continue the proceedings, Norma's counsel argued against the termination of parental rights. She noted "that the mother has maintained regular . . . contact with this child," and "the child indicates to us that she would like that contact to continue." She concluded, "I believe that based on the limited time that [SSA] has had to evaluate this child's adoptability, that the court cannot find clear and convincing evidence that she will be adopted. If the court however finds that there is sufficient evidence, it's my argument that [section 366.26, subdivision] (c)(1)(A) applies."

The court's response was indignant: "So, in this case, you are taking the position of arguing for the parent[—]the parent who reunified with the man who sexually abused her child repeatedly, who left the state with the child so that the child could once again be reunified with the person who sexually abused her repeatedly . . . and . . . her half brother who, himself, has a criminal background and [is] a gang member. So, that's the position that you are taking?"[9] When counsel replied that she was merely expressing the views of her client "who wishes to maintain a relationship with her mother," the

[9]From what we can see in the record, it appears no evidence was available to the court that might have established if and when Katheryn "reunified" with her daughter's alleged molester, other than the cryptic offer of proof made by Norma's attorney, which referred to Norma's "parents," and a single sentence in SSA's December 10, 1999 report, which stated that Norma "has had contact with [Edwin D.] over the past three years." The frequency and nature of that contact was not addressed. However, when questioned, Norma "denied any sexual abuse in the past three years." In the reports it prepared during Katheryn's and Norma's absence from California, SSA consistently expressed its suspicion that Katheryn left

court announced it was "quite appalled that the attorney for the child has taken this position."

The court continued, "We know about what this mother has subjected this child to." It then detailed Katheryn's "educational neglect," her "criminal act [of taking] the child out of the state," and conduct which had placed her "child in harm's way." The court concluded, "I am just appalled that minor's counsel under the guise of the best interests of the[] child, an eight-year-old little girl who can't even read and write because of what her mother has done to her, would take the position that the court should make a (C)(1) finding." It then found Norma adoptable, though difficult to place, and concluded termination of parental rights would not be detrimental to the minor. Finally, the court expressly found the provisions of section 366.26, subdivision (c)(1) inapplicable to the case and ordered a hearing held under section 366.26, subdivision (c)(3) on June 7, 2000.

On April 11, 2000, Katheryn appeared in the Orange County Superior Court, in custody, before another judge. That judge reappointed the public defender to represent her in the dependency matter and, within a week, the public defender filed a notice of intent to file a writ petition under California Rules of Court, rule 39.1B to attack the December 1999 orders and findings.

On May 31, 2000, Katheryn pled no contest to an amended misdemeanor complaint alleging contempt of court (Pen. Code, § 166, subd. (a)(4)). The disposition was terminal, with credit for time served (104 actual days), and the previously filed child abduction charge was dismissed on motion of the district attorney. After receiving and reviewing the public defender's May 12, 2000 petition for a writ of mandate, we stayed the section 366.26, subdivision (c)(3) hearing scheduled for June 7, 2000, and calendared this matter for oral argument pursuant to the public defender's request.

I

■ As a preliminary matter, county counsel insists the public defender's petition—which purports to be filed under California Rules of Court, rule 39.1B—is untimely and must be dismissed. The public defender counters by

---

the state to rejoin her boyfriend, placing Norma at risk; however, the record reveals no evidence that might have supported its suspicion. Furthermore, no evidence was presented to the court at the hearing which might have indicated her boyfriend was the reason Katheryn fled the state. To the contrary, Katheryn had been evicted from her residence, and SSA's November 10, 1999 report expressly acknowledges she acted out of "fear . . . that 'the state' would take her [child] away."

asking us to find good cause for the late filing[10] or, in the alternative, treat the petition as a "non-statutory petition for mandate." We must, of course, agree with county counsel that, were we to consider the petition as one filed under rule 39.1B, it would be untimely. It is manifestly late. (See fn. 4.) But we need not determine whether good cause existed to excuse its tardiness because, as we have indicated, we construe the claims in the petition as sounding in habeas corpus.

It is true that the order setting a hearing under section 366.26 was made on June 4, 1999, and the public defender's notice of intent to file a writ petition under California Rules of Court, rule 39.1B, was not filed until April 18, 2000—more than 10 months later. But the court's June 4 order was made under extremely unusual and artificial circumstances. Katheryn was not represented by counsel at the time, and nothing in the record provides any reason to believe she was aware of the proceeding. Moreover, while the court had previously ordered reunification services, no such services were ever rendered because Katheryn and Norma were already together, absent from the state. Likewise, the "termination" of reunification services on June 4, 1999, was merely a fiction used to move the case toward final resolution.[11]

Subsequently, in December 1999, the court went ahead and made crucial findings after not only Norma's counsel, but also the social worker, pleaded for a continuance because evidence was not yet available to support such findings. Although Norma had lived virtually all her life with her mother, developed a strong bond with her, and asked repeatedly to rejoin her after they were separated, the court found there would be no benefit to continuing the parent-child relationship, no detriment to the child from a termination of parental rights, and that adoption was the option best suited to Norma's needs. All of these findings were made after Katheryn's appointed counsel had been relieved.

---

[10]An untimely petition must be summarily dismissed "in the absence of some good cause showing to explain the delay." (*Karl S. v. Superior Court* (1995) 34 Cal.App.4th 1397, 1404 [41 Cal.Rptr.2d 84]; see also *Jonathan M. v. Superior Court* (1995) 39 Cal.App.4th 1826, 1831 [46 Cal.Rptr.2d 688].)

[11]We can discern neither benefit from nor authority for such a procedure. When the progress of ongoing dependency proceedings is thwarted because a parent absconds with his or her child and stays beyond the court's jurisdictional grasp, the court has no reason to do anything but issue warrants for their arrest and return and await their return. (Cf. *Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164 [39 Cal.Rptr.2d 743] [court cannot initiate proceedings to terminate parental rights unless adequate reunification services have, in fact, been provided—even for an incarcerated parent].) The statutory scheme has empowered the district attorney to take steps on behalf of the court to locate and obtain the return of the parent and child to the court. (See, e.g., Fam. Code, §§ 3131-3135.) But the court is not empowered to order or terminate reunification services until the prosecutor has succeeded in locating them—or they have otherwise been returned to the court's jurisdiction.

Thus, the overriding issue raised by the facts pled in the public defender's petition concerns whether Katheryn, who was indigent, was entitled to representation by counsel at the various hearings held in her absence from California. We therefore turn our attention to that question.

II

█ Katheryn complains that the juvenile court erred by failing to appoint counsel to represent her at the June 4 and December 10, 1999, hearings and, as regards the December 10 hearing, by failing to ensure she either had the opportunity to attend or to validly waive her appearance there. We agree with each claim. █ Furthermore, we find that the public defender was erroneously relieved from representation of Katheryn in the first place.

Under section 317, subdivision (d), counsel appointed for an indigent parent "shall represent the parent . . . at the detention hearing and at all subsequent proceedings before the juvenile court. Counsel shall continue to represent the parent . . . unless relieved by the court upon the substitution of other counsel *or for cause.*" (§ 317, subd., (d), italics added.)

In *Janet O. v. Superior Court, supra,* 42 Cal.App.4th 1058, the Court of Appeal construed the phrase "for cause" in section 317, subdivision (d) to include situations in which indigent parents demonstrate a desire to abandon their children and simultaneously disconnect themselves from the dependency proceedings. In such situations, the court held that, after appropriate notice is given to the parents, their appointed attorneys can be relieved. (42 Cal.App.4th at pp. 1064-1067.) In this case, the court followed *Janet O.* and relieved the public defender on May 6, 1998, while Katheryn was still in hiding with her daughter. But *Janet O.* was inapposite and should not have been applied.

In *Janet O.,* the parents had stopped attending the dependency proceedings and refused visitation with their children. (*In re Janet O., supra,* 42 Cal.App.4th at pp. 1061-1062.) As the court put it, "the evidence strongly suggests that petitioners have lost all interest in not only the dependency proceedings, but in their children as well. Under these circumstances, the juvenile court not only is permitted to, but should, revisit the issue of whether a parent continues to desire representation." (*Id.* at p. 1065.) The evidence before the juvenile court was very different here.

Katheryn did not abandon her child. In fact, she was so concerned that she might lose Norma, she removed her from the state and went into hiding for

three years. However we might feel about such conduct, it cannot be gainsaid that during that time, Katheryn did anything but demonstrate a lack of interest in her child. She was her primary caregiver. And though Norma suffered educationally and developed dental anomalies, both problems are remediable. Otherwise, it appears Norma currently has no developmental delays, successfully involves herself in age-appropriate tasks, and, as would be expected, has some significant degree of attachment to her mother—who has cared for her all but a few days of her life.

Given these facts, good cause to relieve the public defender did not exist within the meaning of *Janet O.*—especially since the court, at the point it relieved Katheryn's appointed counsel, was about to embark upon a process of extending reunification services to a mother and daughter who were already together and logistically had no way to take advantage of any services, then discontinuing those nonexistent services, and taking steps towards terminating the parental rights of the only parent the child had ever known.

██ Of course, whether counsel was properly relieved under the statute or not, we think a denial of the right to counsel *under the circumstances of this case* manifestly offends the concept of fundamental fairness which must, under the due process clause, characterize dependency proceedings. (*Lassiter v. Department of Social Services* (1981) 452 U.S. 18, 33-34 [101 S.Ct. 2153, 2163, 68 L.Ed.2d 640]; also see *Fuentes v. Shevin* (1972) 407 U.S. 67, 80 [92 S.Ct. 1983, 1994, 32 L.Ed.2d 556] ["the right to notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner' "]; accord, *In re James Q.* (2000) 81 Cal.App.4th 255, 263 [96 Cal.Rptr.2d 595]; *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1659 [54 Cal.Rptr.2d 722]; *In re Crystal J.* (1993) 12 Cal.App.4th 407, 412 [15 Cal.Rptr.2d 613].)

██ As was explained in *In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1153, footnote 6 [65 Cal.Rptr.2d 913], "An indigent parent in a state-initiated dependency, which is civil in nature, has no general right under either the federal or the state Constitution to the assistance of appointed trial counsel at every stage of the proceeding. [Citations.] [But] [t]he appointment of counsel is a constitutional imperative . . . when . . . fundamental fairness requires such an appointment. [Citation.] Whether fundamental fairness is likely to be a hazard is determined by weighing, one against the other, . . . (1) the private interests at stake; (2) the government's interest; and (3) the risk that the procedures used will lead to erroneous decisions. [Citations.] The inquiry necessitates consideration of the factual circumstances and the procedural setting of the case at the time when the error is said to have occurred. [Citation.]"

■ Here, an examination of the proceedings and a balancing of the interests involved demonstrates clearly that the absence of counsel was likely to lead to erroneous decisions. Further, the record provides no basis for concluding that the government's interests in terminating Katheryn's parental rights outweighed either her interests or those of her daughter, with whom she evidently had formed a strong attachment.

When the court made its finding that termination of parental rights would not be detrimental to Norma, SSA had not even had the opportunity to complete its assessment of the minor because of her recent return to Orange County. But the court knew that, during her three years away, Norma had been in her mother's care and, despite being behind in her schooling and in need of dental care, was apparently well-adjusted, with no developmental delays. Thus, it appears that, at the time of the December 1999 hearing, the interests of Katheryn and her child outweighed the government's interests, entitling her to representation by counsel as a matter of fundamental fairness.

With no counsel present to represent her at the June and December 1999 hearings, the court found that (1) Norma was adoptable, though difficult to place; (2) she would not suffer detriment should parental rights be terminated; and (3) the exceptions listed in section 366.26, subdivision (c)(1) were inapplicable. Further, the court ordered a hearing pursuant to section 366.26, subdivision (c)(3). None of these conclusions and orders were supported by the evidence.

Although the social worker cautioned the court that she had not had time to complete a full assessment of the child and specifically observed that she could not express an opinion on whether the mother-child relationship was of benefit to Norma, the court plunged into an immediate finding that the termination of parental rights would not be detrimental to the child. Joined by Norma's attorney, the social worker requested a continuance, but their request was denied. And despite the fact the social worker indicated she had never spoken to Norma about the possibility of adoption and, indeed, thought it imprudent to do so, the court made an immediate finding that Norma was adoptable and that adoption was the appropriate goal toward which SSA should work prior to the next hearing date.

As we have said, these orders were ill-advised and had no evidentiary support. And it seems manifest that, had Katheryn been represented by counsel, they would each have been challenged—both in the juvenile and appellate courts. Thus, the juvenile court's failure to ensure Katheryn was represented by appointed counsel in this case deprived her of opportunities she should have had to challenge the court's orders and findings in a timely

fashion and created fundamental unfairness that violated minimum due process requirements.

By the time of the December 1999 hearing, the court knew where Katheryn was: locked inside a jail cell in Spokane as a result of the court's own process. The court knew Katheryn had maintained physical custody and care of Norma during the years they were absent from California. And the court had been informed by SSA that Katheryn had acted out of fear that "the state" would take her daughter away. Thus, it had strong evidence from which it reasonably might have inferred that Katheryn was still interested in her daughter's placement and concerned for her welfare. Under these circumstances, the error in relieving counsel should have been apparent, and counsel should have been reappointed to represent Katheryn's interests. Counsel could then have contacted her in the Spokane jail and determined how she preferred to proceed or whether she wished to waive her right to counsel or her presence at subsequent hearings (decisions we think would have been highly unlikely given Katheryn's subsequent decision to attack the court's orders and findings).[12]

Instead, as we have already indicated, the trial judge announced twice that she was "appalled" anyone would even make an argument on behalf of the mother who had "reunified with the man who sexually abused her child repeatedly, who left the state with the child so that the child could once again be reunified with the person who sexually abused her repeatedly . . . and . . . her half brother who, himself, has a criminal background and [is] a gang member." So far as the record is concerned, these factual statements made by the court are unfounded. And the tone of the court's comments demonstrates a personal involvement in the case that one might expect from an advocate, not a neutral observer charged with the duty of ascertaining the best interests of the child involved.

We are aware SSA initially became involved in Katheryn's life after receiving word that her boyfriend may have molested her daughter. But neither Katheryn nor the police were ever convinced of the truth of that allegation. Moreover, according to SSA's own initial reports, Katheryn

---

[12]Katheryn argues that because she was indigent and incarcerated, the court had a statutory duty under Penal Code section 2625, subdivision (d) to ensure her presence at the section 366.26 hearing. That subdivision provides, "No proceeding may be held under . . . Section 366.26 . . . without the physical presence of the prisoner or the prisoner's attorney, unless the court has before it a knowing waiver of the right of physical presence signed by the prisoner or an affidavit signed by the warden . . . ." (*Ibid*) County counsel disagrees with Katheryn's contention, insisting the statute only applies to California prisoners. Given our resolution of the public defender's petition, we need not resolve their debate about the scope of the statute's coverage here.

provided Norma "good care" up to that time, and Norma had been living with her virtually all her life, forming a strong and perhaps permanent bond. Nonetheless, Katheryn was drawn into the unfamiliar world of dependency proceedings, forced to deal with the court-mandated breakup of her family, and essentially took her daughter into hiding. Her conduct was, of course, illegal, *and we do not by any means condone it.* But we are somewhat taken aback that the court below was so obviously incensed by it.

As the United States Supreme Court has explained, "[T]he ultimate issues with which a termination hearing deals are not always simple, however commonplace they may be. . . . The parents are likely to be people with little education, who have had uncommon difficulty in dealing with life, and who are, at the hearing, thrust into a distressing and disorienting situation." (*Lassiter v. Department of Social Services, supra,* 452 U.S. at p. 30 [101 S.Ct. at p. 2161].) The record paints such a picture of Katheryn.

By removing herself and her daughter from the court's jurisdiction, she committed an unlawful act. But the act was manifestly motivated by fear of what the state might do to her family rather than disinterest in the welfare of her child. Her criminal act has now been properly punished in a criminal forum. And this dependency case cannot be used to serve a similar purpose because the legislative design for such proceedings requires that we focus on how to foster the best interests of the child, not on how most effectively to punish her mother.

It is certainly true that all the smoke and mirrors (e.g., ordering and then terminating reunification services in the family's absence from the jurisdiction) were employed by the court as a result of the ill-advised choice *Katheryn* made to absent herself and her daughter from California. And were we merely concerned with the propriety of Katheryn's conduct, we would have no compunction about denying her any relief. But we are not primarily concerned with Katheryn's conduct in this proceeding. Rather, our paramount concern is for her daughter.

■ We are mindful that "the purpose of child dependency proceedings is not to punish persons who have committed acts of abuse; it is to serve the child's best interests." (*In re Kieshia E.* (1993) 6 Cal.4th 68, 81 [23 Cal.Rptr.2d 775, 859 P.2d 1290] (dis. opn. of Kennard, J.).) ■ And here, orders were eventually made by the court—orders that doubtless would affect Norma for the rest of her life—at a time when the person Norma was most attached to and dependent upon was absent outside the geographic jurisdiction of the court and unrepresented by legal counsel. Not only was this unfair to Katheryn, it put Norma's welfare at unnecessary risk.

Under the peculiar circumstances presented here, the juvenile court's decision to proceed with a section 366.26 hearing in Katheryn's absence or, at least, without Katheryn being represented by counsel, was improvident—especially considering the social worker's and counsel's request that the matter be continued so that a proper assessment of the situation might be completed. Since the court was aware of Katheryn's whereabouts, *and* since she was being held in custody as a result of the court's own process, we hold that the court had a duty to appoint counsel to act on her behalf and to continue the proceedings until her views could be ascertained. The failure of the court to do so rendered the proceedings fundamentally unfair and deprived Katheryn of her right to due process of law.

Because we think it apparent that a more favorable result would have been obtained at the hearings had counsel been present or available to seek appellate review of the court's orders (*In re Kristin H., supra,* 46 Cal.App.4th at p. 1668), we exercise our power to treat her petition as one for habeas corpus (see, e.g., *Neal v. State of California* (1960) 55 Cal.2d 11, 16 [9 Cal.Rptr. 607, 357 P.2d 839]), and grant habeas corpus relief by vacating the court's June and December 1999 orders and findings. Because we find Katheryn was denied her due process right to counsel, the petition, so construed, is granted.

Let a writ of habeas corpus issue to the juvenile court with directions to set aside its orders and findings of June 4 and December 10, 1999, and to set and hold a new review hearing, *ab initio*.

Sills, P. J., and Crosby, J., concurred.