Filed 9/26/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re J.P., a Person Coming Under the Juvenile Court Law. | B281438 (Los Angeles County Super. Ct. No. BK05050) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. C.P., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Stephen C. Marpet, Commissioner. Reversed and remanded with directions.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Mary C. Wickham, County Counsel, R. Keith Davis, Assistant County Counsel, and David Michael Miller, Deputy County Counsel, for Plaintiff and Respondent.

The mother of a dependent child in a group home placement filed a Welfare and Institutions Code section 388[1] petition seeking, inter alia, reappointment of counsel. The juvenile court scheduled a hearing on the petition, but did not appoint counsel to represent mother at the hearing. At the section 388 hearing, the juvenile court ruled on mother's petition, but again did not appoint counsel to represent mother. The juvenile court's error in failing to timely appoint counsel for mother resulted in a miscarriage of justice, and we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

J.P. is the youngest of nine children. All his siblings were involved in dependency proceedings at one time or another, and two found adoptive homes several years before J.P. was born. J.P. was born in 2006 and has been in the juvenile dependency system almost his entire life. From 2007 to May 2011, he remained with C.P. (mother) under a family maintenance plan. He was removed from mother's home in May 2011 after she was arrested for assaulting her boyfriend with a deadly weapon. The court appointed counsel to represent mother at the detention hearing. After a contested jurisdiction and disposition hearing in March 2012, the court sustained the petition's allegations, denied mother reunification services, issued a three-year restraining order limiting mother's contact with J.P. to monitored visits, and directed the Department of Children and Family Services (DCFS)

---

[1] All statutory references are to the Welfare and Institutions Code.

2

to address permanency planning and implementation under section 366.26 at the next hearing.[2]

Adoption was originally identified as the permanent plan for J.P., but his mental and emotional health never stabilized to the point where a long-term foster home, let alone a prospective adoptive home, could be identified. Between November 2011 and July 2014, J.P. attempted suicide and had numerous involuntary psychiatric hospitalizations. He suffered from enuresis and encopresis, was quick to anger and tantrum, and was prescribed a regimen of psychotropic medications.

Legal guardianship was the next identified permanent plan, and the court appointed J.P.'s foster parent as his legal guardian in November 2013. After J.P. made another suicide attempt, the guardian—believing she could not provide a safe home for J.P.—requested termination of the guardianship. The most recent permanent plan called for long-term foster care with a nonrelative. J.P. has resided in a group home for more than three years, since his removal from the legal guardian's care in May 2014. In J.P.'s more than six years in out-of-home placements, mother's visits with him have remained monitored.

On May 7, 2014, the juvenile court conducted a detention hearing on the section 387 subsequent petition to remove J.P. from the home of his legal guardian. Neither mother nor mother's counsel was present, but the court relieved mother's counsel. Nothing in the court minutes or the DCFS report for that hearing provides an inkling as to why mother's counsel was

---

[2]     *In re Rebecca H.* (1991) 227 Cal.App.3d 825, 838.

relieved.[3]

Mother still attended most of J.P.'s juvenile court hearings after counsel was relieved. She consistently visited J.P. in his group home.

On November 3, 2016, mother filed a section 388 petition requesting reappointment of counsel, family reunification services, and extended and liberalized visits with J.P., including "unmonitored off ground visits and overnight visits." At the time she filed the petition, she was entitled to two, one-hour monitored visits per month at the group home. DCFS did not have the discretion to liberalize the visitation schedule. Mother attached five letters of support to her petition: three from individuals at J.P.'s group home who were regularly interacting with mother and child; one from the counselor at her methadone maintenance program; and one from J.P.'s oldest sibling, who was interested in exploring J.P.'s long-term placement with him.

A review hearing had previously been scheduled for November 8, 2016. On that date, a "Last Minute Information" report was filed, summarizing interviews by J.P.'s Court Appointed Special Advocate (CASA) with the child's group home therapist and family specialist. Both individuals noted mother had been visiting every other week for the past six months. Group home staff felt it would benefit the child to see mother more; they relied on mother "to help console [J.P.] when he is having an outburst;" they noted mother's "influence on [J.P. was] supportive and in alignment with his treatment plan" and she presented "a calming influence" on him. The CASA noted every

---

[3] The reporter's transcript for that hearing is not part of the appellate record before us.

time mother visited, J.P. "states . . . he wants to see his mom more and wish[es] it could be unmonitored."

The juvenile court began the November 8, 2016 hearing by asking counsel for DCFS if he wished to be heard concerning mother's petition. DCFS's counsel, who acknowledged he had not seen the section 388 petition, recited events concerning mother going back five years, suggested mother's visits were responsible for J.P.'s "[deterioration] to the point where [the child] could not stay in a foster home" and stated DCFS "has very strong beliefs that . . . any further . . . visitation would be detrimental to [J.P.] at this time without a full hearing." Without asking for the views of minor's counsel, the juvenile court agreed to set a hearing. At that point, the following exchange occurred:

"[Minor's Counsel]: Would the court be inclined to appoint counsel for mother based on her having a 388 hearing.

"[DCFS's Counsel]: The court's been denying that.

"The Court: I'm not going to appoint counsel. [¶] We'll set it over for a hearing."

The section 388 hearing was conducted as scheduled on December 8, 2016. J.P. was present with his CASA. The social worker's report for the section 388 hearing reiterated the positive reports from J.P.'s group home concerning mother's increased involvement with the child and acknowledged the increased contact was beneficial to him. The report criticized mother's minimization of the event that led to J.P.'s removal from her home more than five years earlier as well as mother's denial of extensive DCFS involvement. The social worker recommended a family reunification plan and increased visitation.

The juvenile court initially acknowledged to mother and J.P. the progress it saw in the current report was "very exciting."

5

The court announced it would grant the section 388 petition, order six months of reunification services, and continue with monitored visits with DCFS discretion to liberalize. J.P.'s counsel immediately asked for unmonitored visits on the group home premises. The juvenile court responded, "Good idea," but then DCFS's counsel asked to be heard and requested that J.P. leave the courtroom.

It is not necessary to recite the arguments made by DCFS's counsel, but by the time he asserted mother needed a psychiatric evaluation to determine whether she should be on medication, minor's counsel appropriately interrupted and asked the juvenile court to "please make a ruling to appoint mother a lawyer." The juvenile court responded, "I'm thinking about it as we're talking," but did not appoint counsel for mother, did not continue the hearing, and did not order unmonitored visits on the group home premises. Instead, the juvenile court advised, "we'll have an attorney who represented you in the past get in touch with you. She's not here now."[4] When mother asked the juvenile court commissioner to repeat the attorney's name, he replied, "You're an experienced litigant in my courtroom."

Minor's counsel also objected on mother's behalf to the "plethora of services" the juvenile court ordered for mother and asked "that if the court is going to order her into all these services [I request] that we put it over, allow her to have counsel to represent her." Before the juvenile court could address this request, DCFS's counsel interrupted to argue "these are the

---

[4] The court minutes reflect, "The court will appoint Ms. Fahrenholz to represent the mother. Ms. Fahrenholz was not present when the court called and or concluded the case."

services that the court would have been asked to order if she [were] given services [years ago]."

J.P.'s CASA then advised that the child wished to address the court. When J.P. was brought back into the courtroom, the court told him, "Your mom filed papers today. I want more time. I want her to ultimately get more involved in your life and look to a future possibly of getting back with your mom. I told her that I'm going to allow that to happen and she's going to start to have more contact with you and do some things and hopefully we'll come back and see how things are progressing. . . ." The juvenile court then said to J.P.: "Now I want to hear from you. What do you want to say?" J.P.'s response: "I want to go home."

Mother timely appealed, challenging the juvenile court's denial of her requests to reappoint counsel before the section 388 hearing and for unmonitored visits with J.P.

During the pendency of this appeal, we asked counsel to advise this court, "Whether, and if so to what extent, the juvenile court has made any further orders respecting [mother's] visitation with J.P. following the order made at the December 8, 2016 hearing. Appellate counsel for mother and DCFS responded. DCFS's counsel provided copies of orders for the following dates, and we take judicial notice of them: January 24, 2017, April 25, 2017, and June 8, 2017.

The January 24, 2017 minutes reflect that appointed counsel advised she may have a conflict and a section 388 petition filed by mother was denied without a hearing. On April 25, 2017, mother was present without appointed counsel. The juvenile court granted DCFS's section 388 petition and terminated family reunification services for mother. Mother's visits with J.P. were to be once per week for two hours, with

DCFS discretion to liberalize.  Mother again appeared on June 8, 2017, without appointed counsel.  Visitation orders for her remained the same.

## DISCUSSION

**I.    The Juvenile Court Erred in Failing to Reappoint Counsel Before the Section 388 Hearing**

The juvenile court is statutorily required to appoint counsel for the parent of a child who is in an out-of-home placement (or as to whom the petitioning children and family services agency is recommending an out-of-home placement) if the parent "is presently financially unable to afford and cannot for that reason employ counsel . . . unless the court finds that the parent . . . has made a knowing and intelligent waiver of counsel as provided in this section."  (§ 317, subd. (b).)

Once appointed, counsel "shall represent the parent . . . at the detention hearing and at all subsequent proceedings before the juvenile court.  Counsel shall continue to represent the parent . . . unless relieved by the court upon the substitution of other counsel or for cause. . . ."  (§ 317, subd. (d).)

As our colleagues in Division One observed 24 years ago, "There is nothing vague or ambiguous about the legislative command—in the absence of a waiver, the juvenile court must appoint an attorney to represent an indigent parent at the detention hearing and at all subsequent proceedings, and the attorney *shall* continue to represent the parent unless relieved by the court upon the substitution of other counsel or for cause."  (*In re Tanya H.* (1993) 17 Cal.App.4th 825, 829; see also *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1659 (*Kristin H.*); *In re Malcolm D.* (1996) 42 Cal.App.4th 904, 914.)

8

Despite the unambiguous statutory mandate, the juvenile court relieved mother's appointed counsel on May 7, 2014.[5] Mother was then without representation for more than two years. During that time, J.P. resided primarily in a group home and only briefly in several foster homes.

Nothing in the record suggests mother's counsel ever should have been relieved; but as soon as mother asked for the reappointment of counsel in her section 388 petition, her right to court-appointed counsel, if she could not afford an attorney, was "unqualified." (*In re Tanya H., supra,* 17 Cal.App.4th at pp. 831-832.)[6]

Nonetheless, at the hearing on November 8, 2016, when minor's counsel reminded the court of mother's request for an attorney, the immediate response by DCFS's counsel on the record was, "The court's been denying that."[7] And the court did.

---

[5] Mother did not appeal from that ruling, although it is not clear from the record before us when or how she was given notice of the court's decision to relieve her counsel—neither mother nor her court-appointed attorney was present on May 7, 2014. In this appeal, DCFS has not suggested mother ever knowingly waived her right to counsel or that appointed counsel was removed for cause.

[6] See also California Rules of Court, rule 5.534(c): "At each hearing, the court must advise any self-represented . . . parent . . . of the right to be represented by counsel and, if applicable, of the right to have counsel appointed, subject to a claim by the court or the county for reimbursement as provided by law."

[7] In its respondent's brief, DCFS wrote, "DCFS expressed no opinion regarding the issue [mother's request for appointment of

Although mother had the support of minor's counsel and J.P.'s CASA at the December 8, 2016 hearing on her section 388 petition, she did not have the assistance of counsel. It was not until the end of that portion of the hearing, after minor's counsel broached the subject for the third time, that the juvenile court announced it would appoint counsel for mother going forward.

## II.   The Error Resulted in a Miscarriage of Justice

### A.   *Standard of Review*

The harmless error standard has long applied to an appellate court's review of the denial of a parent's statutory right to counsel. (*Kristin H., supra,* 46 Cal.App.4th at pp. 1667-1668.) Citing *People v. Watson* (1956) 46 Cal.2d 818, 836, the *Kristin H.* court held a parent who is denied the statutory right to counsel must demonstrate a reasonable probability that a more favorable result "'would have been reached in the absence of the error.'" (*Kristin H., supra,* 46 Cal.App.4th at p. 1668; see also *In re Malcolm D., supra,* 42 Cal.App.4th at p. 919; *In re Nalani C.* (1988) 199 Cal.App.3d 1017, 1028; *In re Justin L.* (1987) 188 Cal.App.3d 1068, 1078.)[8]

The Supreme Court's analyses in *In re Celine R.* (2003) 31 Cal.4th 45 (*Celine R.*) and *In re James F.* (2008) 42 Cal.4th 901

---

counsel] below and takes no position on appeal," but then cited to the page in the reporter's transcript where DCFS's counsel expressed his opinion that the juvenile court should not appoint an attorney to represent mother.

[8]   See also *In re Ronald R.* (1995) 37 Cal.App.4th 1186, 1195, where the Court of Appeal applied the harmless error standard to review the juvenile court's erroneous decision to permit appointed counsel for a parent to withdraw.

(*James F.*) solidify application of the harmless error standard. In *Celine R.*, the Supreme Court held, "The California Constitution prohibits a court from setting aside a judgment unless the error has resulted in a 'miscarriage of justice.' (Cal. Const., art. VI, § 13.) We have interpreted that language as permitting reversal [under the harmless error standard] only if the reviewing court finds it reasonably probable the result would have been more favorable to the appealing party but for the error. (*People v. Watson*[, *supra,*] 46 Cal.2d [at p. 836].) We believe it appropriate to apply the same test in dependency matters." (*Celine R., supra,* 31 Cal.4th at pp. 59-60; see also *In re Andrew S.* (1994) 27 Cal.App.4th 541, 550.)

In *James F.,* the Supreme Court discussed whether to apply structural error and reverse a juvenile court decision without a finding of harm or to reverse only if the harmless error analysis demonstrated the ruling resulted in a miscarriage of justice. In choosing the latter approach, the Supreme Court suggested reviewing courts miss the mark when they first conclude an error is structural and then decide for that reason not to engage in a harmless error analysis. Instead, an error should be found to be structural only when it "'def[ies] analysis by "harmless-error" standards'" and cannot "be quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless . . . .'" (*James F., supra,* 42 Cal.4th at p. 917.)[9]

---

[9] The passage reads, "Although the procedural error . . . caused no actual harm to [father], the Court of Appeal nonetheless concluded that the error was structural and therefore precluded harmless error analysis. But the United States Supreme Court has explained that most structural defects 'defy

11

The harmless error analysis applies in juvenile dependency proceedings even where the error is of constitutional dimension.[10] (See, e.g., *In re Brenda M.* (2008) 160 Cal.App.4th 772, 777 (*Brenda M.*); *In re Mark A.* (2007) 156 Cal.App.4th 1124, 1146 [citing cases] (*Mark A.*).) In both *Mark A.* and *Brenda M.,* the juvenile court erred by ordering the fathers to testify after they invoked their Fifth Amendment privilege against self-incrimination. When each father refused to obey the order, the juvenile court levied evidentiary sanctions, striking testimony in *Mark A.* and precluding the father in *Brenda M.* from presenting any evidence or cross-examining witnesses.

The Court of Appeal in each matter engaged in a harmless error analysis and affirmed the order in *Mark A.*, but reversed in *Brenda M.*[11] The *Brenda M.* court explained why the harmless error analysis yielded different results: "In *Mark A.* . . . the

analysis by "harmless-error" standards.' (*Arizona v. Fulminante* ([1991]) 499 U.S. [279,] 309.) Errors that can 'be quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless beyond a reasonable doubt' (*id.* at p. 308) generally are not structural defects. (See *United States v. Gonzalez-Lopez* ([2006]) 548 U.S. [140,] 149, fn. 4 ['here, as we have done in the past, we rest our conclusion of structural error upon the difficulty of assessing the effect of the error'].)" (*James F., supra,* 42 Cal.4th at pp. 916-917.)

[10]     Our Supreme Court has left for another day the issue of whether "the appropriate harmless error standard is harmless by clear and convincing evidence rather than harmless beyond a reasonable doubt." (*James F., supra,* 42 Cal.4th at p. 911, fn. 1.)

[11]     Different panels in Division Three of the Fourth Appellate District decided *Mark A., supra,* 156 Cal.App.4th 1124 and *Brenda M., supra,* 160 Cal.App.4th 772.

12

juvenile court ordered some of the mother's testimony stricken as a sanction for the father's refusal to testify. The appellate panel concluded the error was harmless because '[c]onsideration of the testimony wrongfully stricken would only have bolstered the court's jurisdictional finding.' [*Mark A., supra,* 156 Cal.App.4th at p. 1146.] Here, we do not know how the preparer of the [Social Service Agency] reports would have testified on cross-examination or whether cross-examination might have impaired the preparer's credibility. Thus, we cannot say the juvenile court's error in precluding cross-examination of the preparer was harmless beyond a reasonable doubt." (*Brenda M., supra,* 160 Cal.App.4th at p. 777.)

The harmless error analysis is by definition a case-by-case analysis. Particularized analysis is critical. In juvenile dependency proceedings, no error—even one of constitutional dimension—can be examined based solely on legal principles (no matter how venerable) or only from the parent's perspective. The reviewing court also must evaluate the effect of the error on the best interests of the child. This is so even though "[a] parent's interest in the companionship, care, custody and management of his children is . . . ranked among the most basic of civil rights." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306 (*Marilyn H.*).)

A balancing of interests is required because "[c]hildren . . . have fundamental interests of their own that may diverge from the interests of the parent. [Citation.] [¶] Our task is to interpret the statutory scheme as a whole in a manner that balances the interest of parents and children in each other's care and companionship, with the interest of abandoned and neglected children in finding a secure and stable home." (*In re Jasmon O.* (1994) 8 Cal.4th 398, 419; see also *In re Justice P., supra,* 123

Cal.App.4th at p. 191 ["the very nature of determining a child's best interests calls for a case-by-case analysis, not a mechanical rule"].)

As our Supreme Court noted in *James F.,* "We cannot agree . . . that prejudice is irrelevant in a dependency proceeding when the welfare of the child is at issue and delay in resolution of the proceeding is inherently prejudicial to the child." (*James F., supra,* 42 Cal.4th at p. 917.)  Accordingly, because we conclude the juvenile court's error here is "amenable to harmless error analysis rather than a structural defect requiring reversal of the juvenile court's orders without regard to prejudice" (*id.* at p. 915), we proceed with the harmless error analysis.

### B.     Harmless Error Analysis

To analyze the prejudicial effect of the juvenile court's refusal to appoint counsel for mother in advance of the section 388 hearing, we look to the purpose behind that provision: "[S]ection 388 is vital to the *constitutionality* of our dependency scheme as a whole." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528.)  The standard for evaluating the merits of a section 388 petition is the best interests of the child. (*Id.* at p. 526; see also § 388, subd. (d).)  "[A] primary consideration in determining the child's best interests is the goal of assuring stability and continuity." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)  The petitioning parent has the burden to establish changed circumstances to justify changed orders that will promote the best interests of the child. (*Ibid.*; see also *Marilyn H., supra,* 5 Cal.4th at p. 309.)

The juvenile court properly found mother made a prima facie showing of changed circumstances under section 388 and,

14

accordingly, scheduled a hearing.  That finding gave her "a due process right to a full and fair hearing on the merits.  [Citation.] 'Due process generally requires . . . that parents be given the right to present evidence, and to cross-examine adversarial witnesses, such as the caseworker and persons whose hearsay statements are contained in the reports, "i.e., the right to be heard in a meaningful manner."'" (*In re Hunter W.* (2011) 200 Cal.App.4th 1454, 1463-1464.)

The failure to appoint counsel for mother deprived her of her due process right and prejudicially affected the manner in which the section 388 hearing was conducted.  The facts concerning changed circumstances and the benefit to J.P.'s well-being strongly favored mother's request for more liberal visits, particularly unmonitored visits with the child in his secure group home setting.  Significantly, mother had the support of J.P.'s counsel, therapist, other treatment providers at the group home and CASA, as well as J.P. himself.  DCFS, on the other hand, focused only on mother's shortcomings as a parent and as a less-than-compliant participant in dependency proceedings with her other children.  Although the social worker's report for the section 388 petition acknowledged the benefits to J.P. of increased contact with mother, counsel for DCFS dwelled on mother's past conduct and the reasons the juvenile court sustained the dependency petition in the first place.

Had the court appointed counsel to represent mother, that attorney could have kept the hearing focused on the matters at issue in a section 388 hearing:  changed circumstances and the best interests of the child.  Counsel would have a better ability to highlight the benefits to J.P. of granting increased and more liberalized visitation.  Counsel would also be better equipped to

15

communicate with the social worker and the attorneys representing the child and DCFS.  If needed, counsel could call the social worker and perhaps group home witnesses to testify and would not have permitted the juvenile court to hear only arguments by DCFS's attorney.  (See, e.g., *In re Lesly G.* (2008) 162 Cal.App.4th 904, 915 ["Due process generally requires . . . that parents be given the right to present evidence, and to cross-examine adversarial witnesses, such as the caseworker and persons whose hearsay statements are contained in the reports, 'i.e., the right to be heard in a meaningful manner'"]; see also *In re Sara D.* (2001) 87 Cal.App.4th 661, 673 ["We cannot speculate as to the substance or effect the testimony . . . would have had . . . .  Such testimony may have had an impact on the court's decision. . . .  [¶]  [The error] requires reversal"].)

The social worker's report for the December 8, 2016 hearing and the Last Minute Information filed November 8, 2016 were received into evidence, and they supported mother's request—echoed by J.P.'s counsel—for unmonitored visits on the premises of the child's group home.  DCFS presented no current evidence addressing the best interests of the child to rebut that evidence.  "[I]t seems manifest that, had [mother] been represented by counsel . . . [the orders would] have been challenged . . . .  Thus, the juvenile court's failure to ensure [mother] was represented by appointed counsel in this case deprived her of opportunities she should have had to challenge the court's orders and findings . . . and created fundamental unfairness that violated minimum due process requirements."  (*In re Katheryn S. v. Superior Court* (2000) 82 Cal.App.4th 958, 972-973 (*Katheryn S.*).)

16

## III. Directions on Remand

"[T]he purpose of child dependency proceedings is not to punish persons who have committed acts of abuse; it is to serve the child's best interests." (*In re Kiesha E.* (1993) 6 Cal.4th 68, 81; see also *Katheryn S., supra,* 82 Cal.App.4th at p. 974 ["were we merely concerned with the propriety of [mother's] conduct, we would have no compunction about denying her any relief. But we are not primarily concerned with [mother's] conduct in this proceeding. Rather, our paramount concern is for her [child]"].)

Given the passage of time and perhaps additional changed circumstances, this court is not in a position to make new orders in the first instance. Rather, we remand to the juvenile court with directions to appoint counsel for mother immediately, permit appointed counsel to file a new section 388 petition, and vacate the orders of December 8, 2016, January 24, 2017, April 25, 2017, and June 8, 2017, insofar as they addressed mother's visitation and family reunification plans. (See, e.g., *In re Emilye A.* (1992) 9 Cal.App.4th 1695, 1707, fn. 9 ["reversal . . . simply requires that the proceedings be reconducted because the parents were not properly represented"]; *In re M.F.* (2008) 161 Cal.App.4th 673, 682 ["The error in this matter necessitates that the proceedings return to 'square one'"].)

Pending the hearing on a new section 388 petition, the juvenile court is encouraged to maintain at a minimum mother's current visitation plan, which calls for weekly, two-hour monitored visits. In all other respects, the juvenile court's orders, particularly those concerning J.P.'s adult sibling, M.D., and CASA, are not affected by this decision.

17

## DISPOSITION

The order of the juvenile court is reversed, and the matter is remanded to the juvenile court as indicated above in section III.

CERTIFIED FOR PUBLICATION


DUNNING, J. [*]


I concur:


KRIEGLER, Acting P. J.

---

[*] Judge of the Orange Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

In re J.P.

B281438


BAKER, J., Concurring


I concur in the result, and in what I understand to be the core of the majority's holding: The juvenile court's considered decision to deprive C.P. (Mother) of counsel to prepare and argue her Welfare and Institutions Code section 388 petition—the culmination of a two-year deprivation of counsel—was wrong and demands remediation. I write separately to highlight two points regarding the unique impact that a deprivation of the right to appointed counsel can have (and had here) on the fairness of dependency proceedings.

I

The majority cites *In re Kristin H.* (1996) 46 Cal.App.4th 1635 for the proposition that "[t]he harmless error standard has long applied to an appellate court's review of the denial of a parent's statutory right to counsel." I have my doubts that *In re Kristin H.* is a reliable guide in this case—in that case, unlike this one, the mother was not deprived of counsel; instead, her claim was that her appointed attorney provided ineffective assistance. (*In re Kristin H., supra,* at pp. 1658, 1667-1668.) But regardless, the majority holds the error here is of both statutory and constitutional (due process) dimension, whereas the courts in *In re Kristin H.* and the other deprivation of counsel cases the majority cites were concerned only with a violation of the

statutory right to counsel.[12]  (See, e.g., *In re Malcolm D.* (1996) 42
Cal.App.4th 904, 914; *In re Ronald R.* (1995) 37 Cal.App.4th
1186, 1197; *In re Andrew S.* (1994) 27 Cal.App.4th 541, 546-547,
549; *In re Nalani C.* (1988) 199 Cal.App.3d 1017, 1026; see also *In
re Justin L.* (1987) 188 Cal.App.3d 1068, 1077 [no issue of a
wrongful deprivation of counsel; error asserted was that the
juvenile court improperly denied parent self-representation].)

I agree there can be cases at the margins where the
consequences of error are so apparent as to permit a fairly
reliable counterfactual assessment whether harm results from
the wrongful absence of appointed counsel.  If an unrepresented
parent, for instance, files a Welfare and Institutions Code section
388 petition to argue the Third Amendment to the United States
Constitution requires a juvenile court to terminate jurisdiction
over a dependent child, appointment of even Clarence Darrow

---

[12]      Constitutional errors in dependency proceedings are
generally amenable to review for harmlessness.  But the Court of
Appeal cases the majority cites for that proposition are not
deprivation of counsel cases, and the high court has more than
once drawn a distinction between constitutional errors generally,
and constitutional error that results from a deprivation of
counsel.  (*United States v. Gonzalez-Lopez* (2006) 548 U.S. 140,
150 (*Gonzalez-Lopez*); *Custis v. United States* (1994) 511 U.S.
485, 496; *Arizona v. Fulminante* (1991) 499 U.S. 279, 306-308;
*Chapman v. California* (1967) 386 U.S. 18, 23; see also *In re
Angela C.* (2002) 99 Cal.App.4th 389, 395; *In re Amy M.* (1991)
232 Cal.App.3d 849, 867-868.)  And while it is true that the
dependency context differs from the criminal context, that truism
does nothing to grapple with the difference that remains, even in
the dependency arena, between constitutional errors that involve
a total or prolonged absence of appointed counsel, and
constitutional errors that do not.

would not make a difference.  The majority also makes a fair argument that this is a case at the opposite margin, one where the pernicious consequences of the absence of appointed counsel are so obvious as to permit a conclusion that the juvenile court's error must have resulted in prejudice.

But I believe there is a grey area between the margins where the difference appointed counsel might have made during a dependency proceeding will be more difficult to reliably assess. (See *Gonzalez-Lopez, supra*, 548 U.S. at p. 150 [erroneous deprivation of counsel has "'consequences that are necessarily unquantifiable and indeterminate'" and "[h]armless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe"]; cf. *In re James F.* (2008) 42 Cal.4th 901, 914-915 [concluding an "*error in the procedure used to appoint a guardian ad litem* for a parent in a dependency proceeding . . . . does not *necessarily* require 'a speculative inquiry into what might have occurred in an alternate universe'"], emphasis added.)[13]  Indeed, the majority opinion tends to bear this out, as it cannot avoid fairly speculative language to describe the consequences of even the clear error in this case: appointed counsel "could have kept the hearing focused," "would have a better ability" to make arguments, and "would . . . be better equipped" to communicate with the parties.

---

[13]  The parent in *In re James F.* was represented by counsel throughout the proceedings.  (*In re James F., supra*, 42 Cal.4th at pp. 906-910.)  The error asserted on appeal was that the juvenile court appointed a guardian ad litem for the parent without advising the parent of the purpose or consequences of the appointment.  (*Id.* at p. 910.)

3

Our Supreme Court has said we should not import the structural error doctrine "wholesale, or unthinkingly" into the dependency context. (*In re James F.*, *supra*, 42 Cal.4th at pp. 915-916.) That is right, and I do not advocate for a wholesale importation of the doctrine. But for cases in which there is an egregious deprivation of the foundational right to counsel, we should do more thinking. When a counterfactual inquiry appears too difficult to responsibly undertake, or a counterfactual conclusion relies on inferences that really amount to guesswork, the bias should be in favor of reversal.

II

The majority's directions on remand are to immediately appoint counsel for mother, to permit appointed counsel to file a new Welfare and Institutions Code section 388 petition, and to vacate certain additional court orders as they relate to mother's visitation and family reunification plans. These are all appropriate directions, and I agree with them. I am compelled to add a few words, however, regarding the juvenile court's task on remand to account for the possibility that the error in failing to appoint counsel in connection with Mother's Welfare and Institutions Code section 388 petition may have infected subsequent dependency proceedings.

The new petition that today's decision permits Mother to file can appropriately address both the facts as they existed at the time the uncounseled petition was heard in December 2016, as well as any intervening developments since that time that bear on Mother's visitation with J.P. and his best interests. If it is the case, for instance, that Mother's attorney believes the juvenile court's failure to grant her unmonitored visitation at the

4

December 2016 hearing contributed to subsequent developments that may have been unfavorable to Mother, that is an issue counsel may appropriately raise.  And if such an issue is raised, the juvenile court would greatly facilitate further appellate review, if any, by making the following findings on the record after considering the newly-filed petition: (1) what visitation order the court would have made on the facts as they existed in December 2016; (2) the reasons for the visitation order the court makes considering current conditions; and (3) to the extent these two findings differ, an explanation of the reasons for the difference, including any impact the prior deprivation of counsel may have had on subsequent developments.


BAKER, J.