Filed 11/24/20 (umodified opinion and previous modification order attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re CHRISTOPHER L., a Person Coming Under the Juvenile Court Law. | B305225 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CARLOS L., <br><br> Defendant and Appellant. | (Los Angeles County Super. Ct. No. 17CCJP02800) <br><br> ORDER FURTHER MODIFYING OPINION (NO CHANGE IN JUDGMENT) |

THE COURT:

In light of the California Supreme Court's November 18, 2020 order that *In re S.P.* (2020) 52 Cal.App.5th 963 (*In re S.P.*) not be officially published, this court's November 2, 2020 opinion in the above-entitled matter, as modified per this court's November 12, 2020 order modifying opinion and denying petition for rehearing, is *further* modified as follows:

1.     On page 17, footnote 5, which discusses *In re S.P.*, is deleted in its entirety.

2.	On page 18, the citation to *In re S.P.* is deleted and replaced with the following citation:  (See *James F., supra*, 42 Cal.4th at p. 915; *In re J.P., supra*, 15 Cal.App.5th at p. 800.)

3.	All other citations to *In re S.P.* are deleted.  For the sake of clarity, these other citations appear on pages 3, 16 (two instances), 19, 25, and 27 (two instances).

Where deleted citations to *In re S.P.* were part of a string citation, the punctuation in the remaining portion of the citation is adjusted accordingly.  For the sake of clarity, these adjustments are:

(a)	On page 3, the space and semicolon immediately preceding the deleted citation to *In re S.P.* are deleted;

(b)	On page 16, the space and semicolon immediately preceding each of the two deleted citations to *In re S.P.* are deleted;

(c)	On page 19, the space and semicolon immediately following the deleted citation to *In re S.P.* are deleted, and the introductory phrase "see, e.g." immediately following the deleted citation to *In re S.P.* is replaced with a capitalized version of the phrase, "See, e.g.";

(d)	On page 25, the space and semicolon immediately preceding the deleted citation to *In re S.P.* are deleted; and

(e)	On page 27, the space and semicolon immediately preceding the first deleted citation to *In re S.P.* are deleted.

4.	At the top of page 18, the quotation marks around the phrase "not on guesswork or speculation, but on the undisputed facts before us" are deleted.

5.     On page 19, the punctuation in the first sentence of Discussion section C.1, is adjusted, so that the sentence now reads:

> To assess whether an error in dependency proceedings is harmless, some Courts of Appeal have applied a *Chapman* "harmless beyond a reasonable doubt" standard, and at least two Supreme Court cases have embraced the *Watson* more probable than not standard.

6.     On page 27, in the last sentence *before* Discussion section D, the following clause:  "we further conclude, based 'not on guesswork or speculation, but on the undisputed facts before us' " is replaced with:  we further conclude, based on the undisputed facts

For the sake of clarity, following this modification, that full sentence now reads:

> Moreover, even if the more stringent *Chapman* framework were to apply, we further conclude, based on the undisputed facts and the portions of section 361.5 discussed above, that the errors were also harmless beyond a reasonable doubt.

These modifications do not constitute a change in the judgment.

_____

ROTHSCHILD, P. J.          CHANEY, J.          BENDIX, J.

3

Filed 11/12/20 (unmodified opn. attached)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re CHRISTOPHER L., a Person Coming Under the Juvenile Court Law. | B305225 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 17CCJP02800) |
| Plaintiff and Respondent, | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING (NO CHANGE IN JUDGMENT) |
| v. | |
| CARLOS L., | |
| Defendant and Appellant. | |

THE COURT:

The opinion in the above-entitled matter filed on November 2, 2020 is modified as follows:

1.     On page 11, in the first paragraph of the Discussion, the word "certain" is inserted between the words "to participate in" and "dependency proceedings."  That sentence now reads:

> Father also argues that when the juvenile court
> conducted the jurisdiction/disposition hearing without
> Father or Father's counsel present, it violated Penal Code

section 2625, which guarantees incarcerated parents the opportunity to participate in certain dependency proceedings.

2. On page 12, the following is deleted: "(See *In re Jesusa V.* (2004) 32 Cal.4th 588, 625 (*Jesusa V.*) [applying *Watson* harmless error analysis to violation of Penal Code section 2625 that denied the father the ability to personally participate in dependency hearing]; *In re Andrew M.* (2020) 46 Cal.App.5th 859, 864, 867 (*Andrew M.*) [failure to appoint counsel for the presumed father reviewed for harmless error under *Watson*].)"

3. In the first full paragraph on page 13, the word "only" is deleted from the third sentence. That sentence now reads:

Presumed fathers are entitled to appointed counsel and reunification services.

4. In the first full paragraph on page 13, "(*In re Zacharia D.* (1993) 6 Cal.4th 435, 451; see also *Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 596 [distinguishing the greater rights that presumed fathers have as opposed to biological fathers].)" is deleted *and replaced* with the following:

(*In re Zacharia D.* (1993) 6 Cal.4th 435, 451 ["only a presumed, not a mere biological, father is a 'parent' entitled to receive reunification services"]; *In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1120 [" '[p]resumed father status entitles the father to appointed counsel, custody (absent a finding of detriment), and a reunification plan' "]; see also *Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 596 [distinguishing the greater rights that presumed fathers have as opposed to biological fathers].)

5.     In the first sentence on page 14, the word "certain" is inserted between the words "participate in" and "dependency proceedings."  That sentence now reads:

> Penal Code section 2625, subdivision (d) requires that a prisoner be permitted to participate in certain dependency proceedings.

6.     On page 14, in the second paragraph, the first short form case citation, "*Jesusa V., supra,* 32 Cal.4th at pp. 621–622;" is replaced with the long form of that citation:  *In re Jesusa V.* (2004) 32 Cal.4th 588, 621–622 (*Jesusa V.*);

7.     On page 14, within the parenthetical in the second paragraph, the words "resulting in the father participating in hearing only through counsel" are inserted between the phrases "subdivision (d)" and "was not jurisdictional."  That parenthetical (and its associated citation) now read:

> *id*. at p. 625 [holding violation of Penal Code section 2625, subdivision (d) resulting in the father participating in hearing only through counsel was not jurisdictional, because "we have regularly applied a harmless-error analysis when a defendant has been involuntarily absent from a criminal trial . . . [and] do not believe the Legislature intended a different result . . . when a prisoner is involuntarily absent from a dependency proceeding"].)

8.     The "*Andrew M.*" citation at the bottom of page 15 is revised as follows:  (*In re Andrew M.* (2020) 46 Cal.App.5th 849, 867 (*Andrew M.*).)

3

9.     On page 18, in the first sentence, the words "causing an incarcerated parent to appear only through counsel" are inserted between the words "notice errors" and "are reviewed." That sentence now reads:

> Moreover, the Supreme Court has held that Penal Code section 2625 notice errors causing an incarcerated parent to appear only through counsel are reviewed under a harmless error analysis in dependency proceedings (see *Jesusa V., supra,* 32 Cal.4th at p. 625), and at least one Court of Appeal has concluded that an incorrect ruling as to a father's parental status resulting in the father being denied appointed counsel was reviewable for harmless error.

These modifications do not constitute a change in the judgment.

Appellant's petition for rehearing filed on November 4, 2020 is denied.

_____

ROTHSCHILD, P. J.          CHANEY, J.          BENDIX, J.

4

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re CHRISTOPHER L., a Person Coming Under the Juvenile Court Law. | B305225 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>CARLOS L.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. 17CCJP02800) |

        APPEAL from order of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge.  Affirmed.

        Christopher Blake, under appointment by the Court of Appeal, for Appellant and Defendant.

        Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

Christopher L., born in December 2017, and I.L., born in February 2017, are the children of appellant Carlos L. (Father) and V.L. (Mother), who is not a party to this appeal. Father was represented by counsel in connection with, and personally participated in, the Welfare and Institutions Code section 366.26[1] permanency planning hearing at which his parental rights regarding Christopher were terminated. He appeals from that termination based on the juvenile court having conducted the earlier jurisdiction/disposition hearing regarding both children in his absence and without counsel present on his behalf. Father had not provided a written waiver of his right as an incarcerated parent under Penal Code section 2625 to participate, personally or through counsel, in the jurisdiction/disposition hearing; to the contrary, in documents provided to the juvenile court before that hearing, Father requested that he be allowed to participate. Before the jurisdiction/disposition hearing, the court was also presented with documents establishing that Father was entitled to "presumed father" status, which carries with it the right to appointed counsel. On these bases, Father argues that he was denied due process at the jurisdiction/disposition hearing, that these due process errors affected the ultimate outcome of the proceedings, and that, in any case, they constitute structural error and trigger automatic reversal.

We agree with Father that the trial court erred, and that these errors affected the due process afforded Father at the jurisdiction/disposition hearing in that they denied him counsel at that hearing. But even errors of a constitutional dimension can be subject to a harmless error analysis in dependency proceedings,

---

[1] Unless otherwise indicated, all further statutory references and citations are to the Welfare and Institutions Code.

2

given the unique nature of such proceedings, unless it is impossible to assess prejudice without engaging in speculation. (See *In re James F.* (2008) 42 Cal.4th 901, 915–919 (*James F.*); *In re J.P.* (2017) 15 Cal.App.5th 789, 800; *In re S.P.* (2020) 52 Cal.App.5th 963, 972, petn. for review filed Sept. 1, 2020, S264203, time to grant or deny review extended to Nov. 30, 2020.) No such speculation is necessary here. The record clearly establishes that, had Father appeared and/or been represented by counsel at the jurisdiction/disposition hearing, Father would not have obtained a more favorable result. We decline Father's invitation to expand current law and deem reversible per se an error in dependency proceedings that is amenable to harmless error analysis. Accordingly, although we are troubled by the errors Father identifies in connection with the jurisdiction/disposition hearing, we conclude that they would not have affected the ultimate outcome of the dependency proceedings and affirm the trial court's order regarding Christopher.

Father's parental rights to Christopher's older sister I.L. were terminated in a separate order, which Father did not appeal. Instead, 18 months after the time for filing such an appeal expired, Father moved this court to apply the doctrine of constructive filing and "extend" Father's appeal regarding Christopher to apply to I.L. as well. But Father concedes that he would make the exact same arguments in an appeal regarding I.L. that he made regarding Christopher, and that these arguments apply in the exact same way to both children. Given our conclusion that Father's arguments regarding Christopher do not warrant reversal, permitting Father to pursue them with respect to I.L. would serve no purpose. Therefore, we deny Father's motion.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Father's Older Children From a Previous Relationship

Father has three older children (not with Mother) who were the subject of separate dependency proceedings, and with whom he failed to reunify. The dependency proceedings regarding Father's older children were initiated in 2013 based on issues related to substance abuse by those children's mother. Father was incarcerated at the outset of the separate proceedings, released approximately three months thereafter, then rearrested for a drug-related offense and returned to prison approximately three months after that release. During the interim period when Father was not in prison, he failed to comply with juvenile court orders, which included an order for regular drug testing. Father's reunification services were terminated. As of the most recent information in the record, two of Father's older children are receiving permanent placement services with a plan of legal guardianship.

### B. Family Background

Father is in his late 30's and has an extensive criminal record, as a result of which he was required to register as a controlled substance offender.[2] Father's criminal history spans over a decade and includes a conviction for robbery, multiple convictions for possession of a controlled substance or being under the influence of a controlled substance, firearms offenses and multiple parole violations.

---

[2] Former section 11590 of the Health and Safety Code required persons convicted of certain offenses to register as a controlled substance offender with law enforcement in the city or county where he or she resides. The Legislature repealed the requirement in 2019. (Stats. 2019, ch. 580, § 1, p. 5212.)

Father and Mother have been married since December 2014. In February 2017, Mother gave birth to I.L.; Father's name is listed on I.L.'s birth certificate.

Mother and Father stopped living together in approximately April 2017, when Father was arrested for robbery, and Mother began living with a man named J.M. Mother and I.L. moved in with J.M. at some point in 2017.

Father was convicted of robbery in October 2017 and began serving a seven-year prison sentence. Months later, in December 2017, Mother gave birth to Christopher. Father's counsel represented during the hearing before this court that Father is eligible for parole in late 2020.

### C. Section 300 Petition Regarding I.L. and Christopher

On December 28, 2017, the Los Angeles County Department of Children and Family Services (DCFS) filed a section 300 petition on behalf of newborn Christopher and 10-month-old I.L., alleging they were at risk due to, inter alia, Christopher being born with a positive toxicology screen for amphetamines and Mother having a history of substance abuse. The petition further alleged risk to both children based on J.M. (who was initially identified as Christopher's father) having a history of substance abuse, and Father's extensive criminal history and status as a registered controlled substance offender. The petition lists Father's address as that of Sierra Conservation Center, the facility at which he was incarcerated at the time.

### D. Detention Hearing and Detention Report

The detention report listed Father as the alleged father of I.L. and J.M. as the alleged father of Christopher. The report noted that Mother and Father were married, and their marriage

certificate was attached to the detention report. The report summarized an interview with J.M., during which J.M. indicated Mother had a young daughter who was not J.M.'s child, and that he was "pretty sure [Christopher] [was] not [his] baby." DCFS further reported that, on the day Christopher was born, Mother indicated J.M. was the father, but that she later told social workers she was uncertain who Christopher's father was.

DCFS provided written notice of the detention hearing to Father at the Sierra Conservation Center address. The detention hearing took place on December 29, 2017, at which time the court determined that notice had been provided as required by law. Neither parent, nor counsel for either parent, appeared. The court noted Father was in state custody and a statewide search was ordered for him. The court postponed findings regarding paternity of either child. The children were detained from Mother, Father, and J.M., and ultimately placed in the custody of the maternal great aunt S.M. (the maternal aunt). The jurisdiction/disposition hearing was set for March 9, 2018, and DCFS ordered to give notice. DCFS sent Father such notice at the Sierra Conservation Center address by certified mail and included his correct inmate identification number. The notice listed both children on it and attached a copy of the petition.

Apparently in response to this notice, on February 21, 2018, Father wrote to DCFS social worker Magdalena Elorriaga, thanking her for "reaching out" and indicating that he had "received [her] letter."[3] Father's letter discussed his participation in

---

[3] The record suggests that what Father refers to as the "letter" from Elorriaga may be the notice of hearing on the petition, which indicates Elorriaga executed and served it via mail on Father 10 days before the date of his letter to her. Further supporting

dependency proceedings as follows: "I wanted to ask if a court appearance is necessary. In your letter you stated that a court date of 3/9/18 will be set. The reason why I'm asking is that this court date will delay my process on being transferred to a California Fire Camp. If possible I was wondering can this matter be handled over the telephone. If so, it would be very much appreciated if we took that route. I love my kids and I will do anything in my power to be with them. The faster I get to camp, the faster I'll be home. . . . Please inform me of my options if a court appearance is needed to handle this matter." Father also requested paternity testing, but indicated he considered both children to be his regardless: "[M]y wife . . . and I had our differences through the years and just so I can have some piece [*sic*] of mind I would like DNA testing on [I.L.] and [Christopher]. Regardless of the outcome I will love them as my own. They are still my kids and I love them dearly." Father requested pictures of the children and that he be kept "updated with the status of my children." Finally, Father asked that his mother be "allowed visitation rights" and inquired as to how she could "go about seeing the children."

E.     **Jurisdictional Hearing and Jurisdiction/ Disposition Report**

Father's letter is referenced in and attached to the report prepared in anticipation of the jurisdiction/disposition hearing. The report further summarizes J.M.'s additional statements that "he believe[d] 80% [Christopher] is his child," as well as Mother's additional statements denying this and identifying Father as the father of both children. The report summarizes Father's DCFS

this conclusion is the fact that Father's letter refers to Christopher as "Baby Boy [L.]," the name used to refer to Christopher in the petition and notice of petition.

history, including that he had failed to reunify with three of his older children in separate dependency proceedings several years earlier.

The jurisdiction/disposition hearing for both I.L. and Christopher was held on March 9, 2018. The jurisdiction/ disposition report and detention report were admitted into evidence at the hearing, including the attached marriage certificate and February 2018 letter from Father.

Neither Father nor counsel for him appeared at the jurisdiction/disposition hearing. Apparently unaware of Father's letter, the court indicated that "[Father] is currently incarcerated, and he has not made himself available . . . . [H]e's been noticed, but he's made no contact with [DCFS]." The court therefore proceeded with the hearing, at which counsel for DCFS and the minor's counsel very briefly argued that the petition should be sustained as pleaded. As to Father, DCFS argued that Father "ha[d] multiple convictions for possession and lost children for permanent placement for not complying with drug treatment." The court sustained the petition as amended to indicate Father is a "registered controlled substance offender," "[t]here is no information that he's ever complied with programming, and he's currently incarcerated based on his extensive criminal history."

The court denied Father (and Mother and J.M.) reunification services for both children "pursuant to [section] 361.5[, subdivision] (b)(10)"—that is, on the basis that they had previously failed to reunify with children deemed dependents and that placement with them would not be in the best interests of the children. (See § 361.5, subd. (b)(10).) The court confirmed both children were suitably placed with the maternal aunt, who had already adopted two of Mother's other children. The paternal grandparents were present, and the court ordered that they be assessed for visits.

8

The court later set a permanency planning hearing for both children, for which the court would "order [Father] out." Adoption with the maternal aunt was the recommended permanent plan. No paternity findings regarding either child were made. The court asked a Los Angeles Dependency Lawyers, Inc. firm to act as a "friend of the court" and contact Father before the permanency planning hearing.

### F. Permanency Planning Hearings

DCFS gave Father written notice of the permanency planning hearing, which he received. DCFS also submitted an order to prison authorities for Father's appearance at the permanency planning hearing.

On November 15, 2018, the court appointed Father counsel, who made a general appearance on Father's behalf. Father's counsel informed the court that Father was asking to participate in the permanency planning hearing telephonically and that he objected to the termination of parental rights.

The court found Father to be the presumed father of I.L. only, based on his having signed her birth certificate.

The permanency planning hearing for both children began on December 19, 2018. Father participated telephonically, as he had requested. Father's counsel indicated that Father would prefer legal guardianship with the maternal aunt, as opposed to adoption, as the permanent plan. The report for the hearing indicates that the children had been in the maternal aunt's care without interruption since their initial detention and were doing well, and that the maternal aunt was not interested in legal guardianship of the children, but was willing to adopt them.

Father's counsel requested DNA testing with respect to Christopher. The court granted the request and continued the permanency planning hearing with respect to Christopher.

The court proceeded to conduct the permanency planning hearing for I.L. only. Father's counsel objected to termination of parental rights as to I.L., but offered no evidence or argument. The court terminated Father's parental rights as to I.L. and gave oral notice of its decision. The court also advised both parents regarding appellate rights as follows: "I'm advising [Father], who is on the phone, and . . . [Mother], who is not present in court, that having terminated their parental rights, each parent is entitled to a free copy of the transcript for appellate purposes. [¶] But they must file their notice of appellate [*sic*] within 60 days." The December 29, 2018 minute order reflecting the termination of parental rights as to I.L. and related "Appeal Rights form(s)" were incorrectly sent to Father at the address on file for J.M.

At a later hearing, upon learning the results of the DNA test indicating that Father was the biological parent of Christopher, the court found Father to be Christopher's alleged father. Counsel for Father was present and did not object to this finding. The court continued the hearing, and Father's counsel indicated it would arrange for Father to participate in that hearing telephonically.

In the interim, Christopher continued to reside with his sister and the maternal aunt, referred to the maternal aunt as "mommy," and was thriving in her care.

DCFS gave notice to Father of the permanency planning hearing for Christopher, which was ultimately held on March 5, 2020. Father was present via telephone and was represented by appointed counsel (a different attorney from the same firm). Father's counsel objected to termination of parental rights, but presented no evidence and offered no argument opposing it. The

court found that Christopher was adoptable, and that none of the exceptions for adoption existed. Accordingly, the court terminated Father's parental rights.

### G. Father's Appeal and *Benoit* Motion

On April 1, 2020, Father filed a notice of appeal from the order terminating his parental rights as to Christopher.

On June 25, 2020—18 months after his parental rights as to I.L. had been terminated—Father filed a motion "to extend his notice of appeal to apply to both [I.L. and Christopher] and/or motion for constructive notice of appeal" pursuant to *In re Benoit* (1973) 10 Cal.3d 72 (*Benoit*). (Capitalization omitted.) DCFS opposed the motion, and this court deferred ruling on the motion pending consideration of this appeal.

## DISCUSSION

Father first argues that the court erred by failing to find that Father had "presumed father" status as to both children, which would have entitled him to appointed counsel at the jurisdiction/disposition hearing. Father also argues that when the juvenile court conducted the jurisdiction/disposition hearing without Father or Father's counsel present, it violated Penal Code section 2625, which guarantees incarcerated parents the opportunity to participate in dependency proceedings. According to Father, these errors denied Father his due process right to counsel, affected the ultimate outcome of the proceedings, and are in any event of such constitutional dimension that they should be reversed regardless of whether they prejudiced Father.[4]

---

[4] DCFS argues that Father has forfeited these arguments, because he failed to raise them through a section 388 motion below, pursuant to *Ansley v. Superior Court* (1986) 185 Cal.App.3d 477.

11

We agree that the trial court erred in the manner Father identifies, but disagree that these errors warrant automatic reversal. The errors identified were not prejudicial under the applicable harmless error analysis articulated in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (See *In re Jesusa V.* (2004) 32 Cal.4th 588, 625 (*Jesusa V.*) [applying *Watson* harmless error analysis to violation of Penal Code section 2625 that denied the father the ability to personally participate in dependency hearing]; *In re Andrew M.* (2020) 46 Cal.App.5th 859, 864, 867 (*Andrew M.*) [failure to appoint counsel for the presumed father reviewed for harmless error under *Watson*].) Nor are they prejudicial under the more stringent "harmless beyond a reasonable doubt" standard

---

(*See id.* at pp. 487, 490 [section 388 petition can be used to challenge lack of notice of earlier proceedings].) Father anticipates this argument in his opening brief, and counters that, although a section 388 motion would have been the proper vehicle for raising these issues, his attorney's failure to make such a motion was the result of ineffective assistance of counsel, and thus any forfeiture should be excused. According to Father, any competent counsel would have filed such a motion, or otherwise raised the errors identified on appeal with the juvenile court. We need not determine whether Father forfeited these arguments, however, because even if he did, we would exercise our discretion to address Father's appeal, which raises fundamental due process issues. (See *In re Gladys L.* (2006) 141 Cal.App.4th 845, 849 [waiver rule not enforced where it conflicts with due process]; see also *In re S.B.* (2004) 32 Cal.4th 1287, 1293 ["[T]he appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue. [Citations.] Although an appellate court's discretion to consider forfeited claims extends to dependency cases [citations], the discretion must be exercised with special care in such matters."].)

articulated in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).  Accordingly, we affirm.

### A.    The Juvenile Court Erred

#### 1.    Error regarding Father's parental status

" 'In dependency proceedings, "fathers" are divided into four categories—natural [or biological], presumed, alleged, and de facto.' [Citation.]" (*In re E.T.* (2013) 217 Cal.App.4th 426, 436–437.) "A father's status is significant in dependency cases because it determines the extent to which the father may participate in the proceedings and the rights to which he is entitled." (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1209.)  Only presumed fathers are entitled to appointed counsel and reunification services.  (*In re Zacharia D.* (1993) 6 Cal.4th 435, 451; see also *Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 596 [distinguishing the greater rights that presumed fathers have as opposed to biological fathers].)

The Family Code sets forth various circumstances under which a man may acquire presumed father status.  (See Fam. Code, § 7611.)  These include that the man "and the child's natural mother are, or have been, married to each other and the child is born during the marriage."  (§ 7611, subd. (a).)  Thus, based on the marriage certificate provided to the court at both the detention and the jurisdictional hearings, Father qualified as Christopher and I.L.'s "presumed father"—and, as such, should have been appointed counsel at the detention hearing.  The trial court erred in failing to so find and appoint counsel for Father prior to the jurisdiction/ disposition hearing.

13

## 2. Penal Code section 2625 error

Penal Code section 2625, subdivision (d) requires that a prisoner be permitted to participate in dependency proceedings regarding the prisoner's child, if he or she desires. Specifically, it provides that a "petition to adjudge the child of a prisoner a dependent child of the court pursuant," inter alia, section 300, subdivision (b), "may not be adjudicated without the physical presence of the prisoner or the prisoner's attorney, unless the court has before it a knowing waiver of the right of physical presence signed by the prisoner or an affidavit signed by the warden, superintendent, or other person in charge of the institution, or a designated representative stating that the prisoner has, by express statement or action, indicated an intent not to appear at the proceeding." (Pen. Code, § 2625, subd. (d).)

The record is clear that Father made no such written waiver. To the contrary, the juvenile court had before it a letter from Father informing DCFS that he wanted to participate in the proceedings, albeit via telephone. The trial court thus failed to comply with Penal Code section 2625, subdivision (d), when it conducted the jurisdiction/disposition hearing without Father or counsel appearing on his behalf. Although the failure to comply with Penal Code section 2625 did not, as Father implies, deprive the court of jurisdiction, it is error. (See *Jesusa V., supra,* 32 Cal.4th at pp. 621–622; *id.* at p. 625 [holding violation of Penal Code section 2625, subdivision (d), was not jurisdictional, because "we have regularly applied a harmless-error analysis when a defendant has been involuntarily absent from a criminal trial . . . [and] do not believe the Legislature intended a different result . . . when a prisoner is involuntarily absent from a dependency proceeding"].)

14

## B.     The Errors Do Not Require Automatic Reversal

Father argues that because the errors he identifies deprived him of counsel at the jurisdiction/disposition hearing, they denied him due process and are reversible per se, regardless of prejudice. But the California Supreme Court has rejected the argument that, in dependency proceedings, every due process error is reversible per se.  (See *James F., supra*, 42 Cal.4th at pp. 915–919.)  In *James F.*, the Supreme Court concluded that error in the procedure used to appoint a guardian ad litem for a parent in a dependency proceeding was "amenable to harmless error analysis rather than a structural defect requiring reversal of the juvenile court's orders without regard to prejudice."  (*Id.* at p. 915.)  In so holding, the Court first "observe[d] that juvenile dependency proceedings differ from criminal proceedings in ways that affect the determination of whether an error requires automatic reversal of the resulting judgment.  The rights and protections afforded parents in a dependency proceeding are not the same as those afforded to the accused in a criminal proceeding."  (*Ibid.*)  On this basis, the Court rejected that "the structural error doctrine that has been established for certain errors in criminal proceedings should be imported wholesale, or unthinkingly, into the quite different context of dependency cases."  (*Id.* at pp. 915–916.)

"*James F.* cited United States Supreme Court authority to explain that generally, an error is structural when it ' "def[ies] analysis by 'harmless-error' standards" ' and cannot ' "be quantitively assessed in the context of *other evidence presented* in order to determine whether [it was] harmless beyond a reasonable doubt." ' [Citation.]  The structural error doctrine is used when ' "assessing the effect of the error" ' is ' "difficult[ ]." ' [Citation.]" (*Andrew M., supra*, 46 Cal.App.5th at p. 867.)  *James F.* also acknowledged that there are "very few constitutional errors that

15

the United States Supreme Court has categorized as structural, not because they defy harmless error analysis, but because prejudice is irrelevant and reversal deemed essential to vindicate the particular constitutional right at issue" (*James F., supra*, 42 Cal.4th at p. 917, citing *United States v. Gonzalez–Lopez* (2006) 548 U.S. 140, 149 (*Gonzalez–Lopez*)), but noted that such authority "has not applied this reasoning outside the context of criminal proceedings . . . nor has it ever held that harmlessness is irrelevant when the right of procedural due process . . . has been violated." (*James F.*, *supra*, at p. 917.) *James F.* concluded that prejudice was not irrelevant in the dependency context, because "the welfare of the child is at issue and delay in resolution of the proceeding is inherently prejudicial to the child," and applied a harmless error analysis. (*Ibid.*)

Courts of Appeal have cited *James F.* for the proposition that "harmless error analysis applies in juvenile dependency proceedings even where the error is of constitutional dimension." (*In re J.P.*, *supra*, 15 Cal.App.5th at p. 798; *In re S.P., supra,* 52 Cal.App.5th at p. 972, petn. for review filed Sept. 1, 2020, S264203, time to grant or deny review extended to Nov. 30, 2020.) "In juvenile dependency proceedings, no error—even one of constitutional dimension—can be examined based solely on legal principles (no matter how venerable) or only from the parent's perspective." (*In re J.P.*, *supra*, 15 Cal.App.5th at p. 799; *In re S.P.*, *supra*, at p. 972 [the concept of automatically reversible structural error "was firmly rejected by our Supreme Court in . . . *James F.*"].) Rather than categorically deeming errors of a certain type "structural" and thus reversible per se, a reviewing court should first consider whether an error in dependency proceedings is amenable to harmless error analysis—that is, whether potential prejudice from the error can be assessed without "necessarily requir[ing] 'a speculative inquiry into

16

what might have occurred in an alternate universe' " (*James F., supra*, 42 Cal.4th at p. 915, quoting *Gonzalez–Lopez, supra,* 548 U.S. at p. 150)—and, if so, apply a harmless error analysis.[5] (*In re J.P., supra*, at p. 800 ["[a]ccordingly, because we conclude the juvenile court's error here is 'amenable to harmless error analysis rather than a structural defect requiring reversal of the juvenile court's orders without regard to prejudice' . . . , we proceed with the harmless error analysis"], quoting *James F., supra*, at p. 915.)

For reasons we discuss in detail in the following section, the circumstances of Father's situation and the nature of the errors identified are such that we can assess whether the court's Penal Code section 2625 error and/or Father being denied counsel at the jurisdiction/detention hearing prejudiced him at the subsequent permanency planning hearings, based "not on guesswork or speculation, but on the undisputed facts before us." (*In re S.P., supra*, 52 Cal.App.5th at p. 975, petn. for review filed Sept. 1, 2020, S264203, time to grant or deny review extended to Nov. 30, 2020.)

---

[5] Division Five of this court interpreted and applied *James F.* in the same way as we do recently in *In re S.P., supra*, 52 Cal.App.5th 963. In arguing that we should take a different approach, Father notes that the appealing parent in *In re S.P.* has filed a petition for review with the Supreme Court based on several issues, including whether *James F.* "need[s] to be clarified to make sure that structural error is a concept that can apply to dependency proceedings depending on the nature of the right." As of the date of this opinion, the Supreme Court has not ruled on the petition. This is not a basis on which to treat *James F.* any differently, as we agree with *In re S.P.'s* interpretation of our state Supreme Court's unambiguous discussion of this issue in *James F.,* and this interpretation is not novel. (See, e.g., *In re J.P., supra*, 15 Cal.App.5th at p. 798.)

Moreover, the Supreme Court has held that Penal Code section 2625 notice errors are reviewed under a harmless error analysis in dependency proceedings (see *Jesusa V., supra,* 32 Cal.4th at p. 625), and at least one Court of Appeal has concluded that an incorrect ruling as to a father's parental status resulting in the father being denied appointed counsel was reviewable for harmless error. (See *Andrew M., supra,* 46 Cal.App.5th at pp. 864, 867.)

Father relies on cases involving a complete failure to provide notice to a parent. (See, e.g., *In re Jasmine G.* (2005) 127 Cal.App.4th 1109, 1116 (*Jasmine G.*) ["the failure to attempt to give a parent statutorily required notice of a selection and implementation hearing is a structural defect that requires automatic reversal"]; *Andrew M., supra,* 46 Cal.App.5th at p. 867, fn. 4 [noting in dicta that the father never having received a section 300 petition would be structural error under *James F.*].) These cases do not assist Father in arguing for automatic reversal in this case, because the errors Father identified are a denial of counsel at the jurisdiction/disposition hearing and a violation of his Penal Code section 2625 right to be present at that hearing—not lack of notice. Indeed, Father expressly states in his opening brief that he "is not contesting that he received notice" of either the jurisdiction/disposition hearing or the permanency planning hearings. The record also reflects he received notice of all hearings, and participated, with counsel, in the hearings resulting in the termination of parental rights from which he now appeals. Cases involving a complete lack of notice present unique concerns, none of which is present here. (See *In re Z.S.* (2015) 235 Cal.App.4th 754, 772 ["[o]nly the failure to attempt to give notice to a parent is a structural defect requiring automatic reversal"], citing *Jasmine G., supra,* 127 Cal.App.4th at p. 1116; see also *In re R.L.* (2016) 4

18

Cal.App.5th 125, 146 ["Unless there is no attempt to serve notice on a parent, in which case the error is reversible per se, notice errors do not automatically require reversal but are reviewed to determine whether the error is harmless beyond a reasonable doubt."].) Father's reliance on such cases is thus unavailing.

Harmless error analysis is appropriate here.

## C. The Juvenile Court's Errors Were Not Prejudicial

### 1. *Watson* and *Chapman* harmless error analyses

To assess whether an error in dependency proceedings is harmless, "some Courts of Appeal have applied a *Chapman* 'harmless beyond a reasonable doubt' standard [citations], [and] [a]t least two Supreme Court cases have embraced the *Watson* more probable than not standard." (*In re S.P., supra,* 52 Cal.App.5th at p. 972, fns. omitted, petn. for review filed Sept. 1, 2020, S264203, time to grant or deny review extended to Nov. 30, 2020; see, e.g., *In re Celine R.* (2003) 31 Cal.4th 45, 59-60 (*Celine R.*) [applying *Watson* standard for failure to appoint separate counsel for minor siblings].) *Watson* requires a "reasonable probability of a more favorable outcome," absent the challenged errors, in order for an error to warrant reversal. (*In re A.J.* (2019) 44 Cal.App.5th 652, 665 [applying *Watson* harmless error standard]; *Celine R., supra,* at p. 60 [court must find it "reasonably probable the result would have been more favorable to the appealing party but for the error"].) Under *Chapman*, by contrast, "the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman, supra,* 386 U.S. at p. 24.)

Two divisions of this court have applied the *Watson* standard to errors relating to a parent's right to appointed counsel. (See, e.g.,

*Andrew M., supra,* 46 Cal.App.5th at pp. 864, 867; *In re J.P., supra,* 15 Cal.App.5th at pp. 798–800 [erroneous failure to grant mother's request for reappointment of counsel before the hearing on her petition for modification].)  We conclude that this standard should apply here as well.  But even if we were to analyze the errors Father identifies under the more stringent *Chapman* standard, our analysis would yield the same result.

### 2. Application of harmless error analysis to the errors Father identifies

Had Father's presumed father status been recognized when the court was first provided with the marriage certificate establishing this status, Father would have been represented by appointed counsel at the jurisdiction/disposition hearing. Separately, had the court complied with Penal Code section 2625, Father or his counsel would have been present at the hearing. Father argues these changes could have led to the marshaling of additional evidence or the pursuit of additional arguments, based on which the court might have provided him with reunification services,[6] thereby changing the trajectory of the proceedings and, potentially, preserving his parental rights.

In light of the applicable statutory presumptions and showings required under section 361.5, however, the errors at issue do not warrant reversal under either a *Watson* or *Chapman* harmless error analysis, as discussed below.

### a. *Section 361.5, subdivision (b) bypass provisions*

Section 361.5, subdivision (b) contains several reunification "bypass provisions" permitting (or, in some cases, requiring) a

---

[6] Father concedes that jurisdiction would have been proper regardless.

court to deny a parent reunification services.  (See *In re A.E.* (2019) 38 Cal.App.5th 1124, 1141; *Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 96.)  Once the juvenile court determines by clear and convincing evidence that a case presents one of the situations set forth in section 361.5, subdivision (b), "the general rule favoring reunification is replaced by a legislative assumption that offering [reunification] services would be an unwise use of governmental resources."  (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478.)  Here, as the court correctly noted, the bypass provision in section 361.5, subdivision (b)(10) applied:  A juvenile court had previously "ordered termination of reunification services for . . . half siblings of [Christopher] because [Father] failed to reunify with the . . . half sibling[s]" and "[Father] has not subsequently made a reasonable effort to treat the problems that led to removal of the . . . half sibling of [Christopher] from [Father]."  (See § 361.5, subd. (b)(1).)  Father does not challenge the applicability of this bypass provision, nor could he.  Father failed to reunify with two of his older children in dependency proceedings based on substance abuse issues, and Father has since continued his drug-related criminality.  Even if Father could offer evidence of efforts to address these issues, no such efforts could have supported a "reasonable effort to address" finding (see § 361.5, subd. (b)(10)), given Father's continuous drug-related criminality.

The services bypass provision in subdivision (b)(12) of section 361.5 applied as well, based on Father's violent felony conviction (robbery), for which he is currently incarcerated. (§ 361.5, subd. (b)(12) ["[r]eunification services need not be provided . . . when the court finds, by clear and convincing evidence . . . [¶] . . . [¶] . . . the parent or guardian of the child has been convicted of a violent felony"]; see Pen. Code, § 667.5, subd. (c)(9) ["any robbery" constitutes a violent felony].)

21

If, as occurred here, a bypass provision is found to apply, a juvenile court "shall not" order reunification unless the court makes certain countervailing factual findings. (§ 361.5, subd. (c)(2).) The countervailing factual finding necessary to support reunification services here would be a finding "by clear and convincing evidence[ ] that reunification is in the best interest of the child." (*Ibid*.) Father has never even met Christopher, acknowledges having "little to no relationship with either child," and will be incarcerated until at least late 2020. Both children have been living with the maternal aunt since Christopher's birth (and thus for almost three years), are thriving in her care, and are on a path to being adopted by her. Given these facts, there is no basis on which even the most competent counsel could have shown it was in Christopher's best interest to override the statutory presumption that reunification services should be denied. (See *In re Marcos G.* (2010) 182 Cal.App.4th 369, 390–391 [no abuse of discretion in court's conclusion that reunification services not in child's best interest where the child was bonded to and had been living with his foster parents for 20 months, and the father's weekly visits with child "were nothing more than friendly visits between the two in which [they would] play"].)

Indeed, Father makes no attempt to argue how a court could have concluded that services would have been in Christopher's best interest, nor does he argue the bypass provision under section 361.5, subdivision (b) is inapplicable.

b.      *Section 361.5, subdivision (e) regarding services for incarcerated parents*

Section 361.5, subdivision (e) instructs a court to order reasonable reunification services for an incarcerated parent "unless the court determines, by clear and convincing evidence, those services would be detrimental to the child." (*Ibid*.) Father does not

explain how the juvenile court could have found that reunification services would not be detrimental to Christopher under the factors identified in the statute. The statutorily-enumerated factors potentially applicable here are: "[T]he age of the child, the degree of parent-child bonding, the length of the sentence, . . . the nature of the crime . . . , the degree of detriment to the child if services are not offered . . . , the likelihood of the parent's discharge from incarceration . . . within the reunification time limitations[,]" and "any other appropriate factors." (*Ibid*.)

Applying these factors, there is not a reasonable probability that reunification services would not be detrimental to Christopher—even if Father had had counsel to advocate against such a finding. Indeed, undisputed facts in the record establish beyond a reasonable doubt that such services would be deemed detrimental to Christopher under section 361.5, subdivision (e)(1). Father is not eligible for parole until approximately three years after Christopher was first detained, so Father's incarceration would have fallen well outside the maximum reunification period, even if the court permitted an extension beyond the applicable six-month limit for children under three years old. (See § 361.5, subd. (a)(1)(B), (3)(A) & (4)(A).) As such, any services the court might order could not have successfully reunified Father with Christopher within the statutory time frame, which section 361.5, subdivision (e)(1) instructs they must in order to avoid proceeding to a permanency planning hearing.[7] (See *In re Ronell A.* (1995)

---

[7] Under certain "unusual" or "extraordinary circumstances" a juvenile court may extend the reunification period as an exercise of its discretionary power to " 'continue any hearing . . . beyond the time limit within which the hearing is otherwise required to be held.' " (*Denny H. v. Superior Court* (2005) 131 Cal.App.4th 1501,

44 Cal.App.4th 1352, 1365–1366 ["Section 361.5, subdivision (e)(1) specifically states reunification services for an incarcerated parent are subject to the 18–month time frame. When a child cannot be returned to the parent within the statutory time frame, the court is required to establish a permanent plan for the child and refer the case for a section 366.26 hearing."].) Instead, ordering reunification services for Father would serve only to delay establishing a permanent home for Christopher with the only caregiver he has ever known. Delaying Christopher a stable, permanent placement in the interest of pursuing a reunification doomed to fail would be detrimental to Christopher.

That the length of Father's sentence prevents him from reunifying with Christopher within the necessary time frame is not the only section 361.5, subdivision (e)(1) factor suggesting detriment to Christopher. As noted, Father admits he has no relationship with Christopher. Moreover, Father's lengthy criminal history of substance abuse related offenses, which caused him to lose custody of his three older children, has escalated to include, most recently, a violent felony conviction, as a result of which he has never even met Christopher. (See § 361.5, subd. (b)(10) & (12).) In light of all of these facts—none of which Father contests—any additional evidence or argument counsel might have offered at the jurisdiction/disposition hearing would

1510, quoting § 352, subd. (a); see, e.g., *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1777–1778.) "[G]iven the imperative to resolve dependency cases in a timely fashion," such a continuance that almost doubles the reunification period would, on the facts of this case, "be outside the scope of what the Legislature intended with enactment of the continuance statute." (*Denny H., supra,* 131 Cal.App.4th at p. 1511; *id.* at p. 1510 [rejecting a six-month illness-based extension of the reunification period on this basis].)

not have caused the court to award Father reunification services for Christopher. (See *In re James C.* (2002) 104 Cal.App.4th 470, 486 [substantial evidence supported denial of reunification services where the father was convicted of several violent felonies and his release date from prison exceeded the maximum period of reunification services]; *In re S.P.*, *supra*, 52 Cal.App.5th at p. 975, petn. for review filed Sept. 1, 2020, S264203, time to grant or deny review extended to Nov. 30, 2020 [finding it was not reasonably likely the father would have been granted reunification services when he had failed to reunify with other children, had no bond with the child at issue in the proceedings, had a lengthy criminal history and history of unaddressed drug abuse, and remained incarcerated at the time of the permanency planning hearing with no plan for the child's care].)

We reject Father's suggestion that considering the duration of Father's incarceration in assessing detriment runs afoul of the admonition in *In re Brittany S.* (1993) 17 Cal.App.4th 1399, that there is no "go to prison, lose your child" law in California. (*Id.* at p. 1402.) Certainly a court may not deny reunification services based solely on a parent being incarcerated, but section 361.5, subdivision (e)(1) expressly provides that a court may consider whether imprisonment may make reunification impossible within the statutory timelines. Here, it would, and reunification services would thus almost certainly be to Christopher's detriment. (See Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2020) § 2.129[3][b], p. 2–540 ["[T]o attempt services in such circumstances may be setting everyone up for failure, including the parent, agency, and child" and "it may be possible to show that providing services to the incarcerated parent would be detrimental to the child since it would delay permanency with no likelihood of success" and "thus only serve[ ] to delay stability for the child."].)

25

Given our conclusion that the termination of reunification services for Christopher was inevitable, Father has presented no basis on which to conclude that the challenged errors could have somehow affected the juvenile court's subsequent decision at the permanency planning hearing to terminate his parental rights. Once "the court has decided to end parent-child reunification services, the legislative preference is for adoption." (*In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 780.) If, as the court found to be the case here, "adoption is likely, the court is required to terminate parental rights, unless specified circumstances compel a finding that termination would be detrimental to the child." (*In re S.B.* (2009) 46 Cal.4th 529, 532.) Father was both present for and represented by counsel at the permanency planning hearings, during which the court concluded that no such countervailing factual finding could be made to override the presumption in favor of adoption and the "compelling" interest in "providing stable, permanent homes for children who have been removed from parental custody" following termination of reunification services. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.) Although Father raises ineffective assistance of counsel arguments in an effort to rebut DCFS's forfeiture arguments (see *ante*, fn. 4), these arguments are not based on any ineffective assistance in connection with the representation provided *during the permanency planning hearings*, save that his counsel made " 'general appearances' when she should have only made special appearances" at those hearings.

Thus, Father cannot establish a reasonable probability that the challenged errors affected the court's termination of Father's parental rights as to Christopher.[8] The errors are therefore

---

[8] In his reply brief, Father appears to raise, for the first time, the argument that such ineffective assistance of counsel—that is,

harmless under *Watson*, the applicable framework for assessing prejudice here. (See *Celine R.*, *supra*, 31 Cal.4th at pp. 59–60; *In re S.P., supra*, 52 Cal.App.5th. at pp. 973–974, petn. for review filed Sept. 1, 2020, S264203, time to grant or deny review extended to Nov. 30, 2020.) Moreover, even if the more stringent *Chapman* framework were to apply, we further conclude, based "not on guesswork or speculation, but on the undisputed facts before us" (*In re S.P., supra*, at p. 975), and the portions of section 361.5 discussed above, that the errors were also harmless beyond a reasonable doubt.

### D. Father's Motion to Extend His Notice of Appeal to Apply to I.L.

In criminal cases, the doctrine of constructive filing permits an appellate court to construe a belated notice of appeal as having been timely filed under certain circumstances, including when an incarcerated criminal defendant made arrangements with his trial attorney to file the notice of appeal, and the attorney failed to do so. (*In re Benoit, supra,* 10 Cal.3d at p. 86.) The California Supreme Court has explained the goal of applying the doctrine under such circumstances is to avoid penalizing a defendant for justifiably relying on his attorney to file the notice of appeal in a timely fashion. (*Id.* at pp. 88–89.)

---

the failure of counsel to bring a section 388 petition to challenge the court's ruling at the jurisdiction/disposition hearing—is itself a basis for reversal (as opposed to a basis for avoiding forfeiture of Father's arguments on appeal). We need not determine whether this constituted ineffective assistance of counsel, as there was no prejudice from the due process violations in connection with the jurisdiction/disposition hearing that such a petition would have raised, for the reasons discussed in the Discussion *ante,* section C.2.

Father concedes that, under longstanding precedent, the constructive filing doctrine does not apply to cases involving the termination of parental rights. (See, e.g., *In re Z.S.*, *supra*, 235 Cal.App.4th at p. 769.) " 'Numerous cases . . . have determined that the special need for finality in parental termination cases and the danger of imperiling adoption proceedings prevails over the policy considerations in favor of constructive filing.' " (*Ibid.*, quoting *In re Alyssa H.* (1994) 22 Cal.App.4th 1249, 1254; *In re A. M.* (1989) 216 Cal.App.3d 319, 322 ["While we recognize the importance of a natural mother or father's parental rights [citations], we deem the special need for finality in [such] cases . . . of paramount importance. Adoption proceedings could be jeopardized if the finality of a judgment . . . were uncertain."].) As one court explained, although the result of this approach "will be harsh in some cases . . . [w]e have considered the desirability of a more flexible standard, but can formulate no rules for the applicability of such a standard under which we could confidently predict that more good would be done than harm." (*In re Isaac J.* (1992) 4 Cal.App.4th 525, 534.)

Father's motion nevertheless requests that the constructive filing doctrine should apply here and permit him to "extend" his timely notice of appeal as to Christopher to also cover I.L., regarding whom he filed no notice of appeal. Father relies in large part on the fact that the California Supreme Court has granted review in *In re A.R.* (Jan. 21, 2020, A158143) [nonpub. order], petition for review granted May 13, 2020, S260928, to address the question whether "a parent in a juvenile dependency case ha[s] the right to challenge her counsel's failure to file a timely notice of appeal from an order terminating her parental rights." (Supreme Ct. Minutes, May 13, 2020, p. 612.) Based on this pending matter, Father argues that the Supreme Court "seems at least open to

28

challenges to" the "widely accepted" policy of "all intermediate appellate courts in this state for more than a quarter of a century" regarding the inapplicability of *Benoit* to proceedings involving the termination of parental rights. He notes his motion is in part intended to preserve his right to seek relief, depending on the outcome of *In re A.R.*

Father further argues that the constructive notice of appeal doctrine should permit an appeal regarding I.L. According to Father, because I.L. has not yet been adopted by the maternal aunt (although this remains the permanency plan), the primary basis for not applying *Benoit* in the dependency context—that doing so would compromise the finality of adoptions—is not implicated here. Father further argues that we should permit this appeal to apply to I.L., because "if [I.L.]'s case had not become separated from that of Christopher . . . the exact same arguments would apply to both. . . . [Christopher's] arguments would apply with equal force to [I.L.] and with the same results had a timely notice of appeal been filed as to her. In other words, we may well have the anomaly of two full siblings, identically situated, with identical arguments that could [be] raised on behalf of both but parental rights will be reversed as to one but affirmed as to the other solely based upon judicial neglect as aided by ineffective assistance of counsel. That cannot and should not be the law."

Father argues he has satisfied the requirements of *Benoit* based on facts, which he supports through attached declarations and citations to the appellate record, suggesting he was not sufficiently informed of how and when to appeal the order terminating his parental rights over I.L. He argues that the advisory of appellate rights the juvenile court provided at the permanency planning hearing regarding I.L. was incomplete, and he declares that his counsel never explained the deadline for an

appeal (or anything else regarding his right to appeal), and that he never received a copy of the minute order terminating his parental rights to I.L. (which, as noted, the record on appeal reflects were mailed to an incorrect address). A declaration from an attorney at the firm of his former counsel provides that Father's file does not contain any indication Father's counsel informed him of his right to appeal or provided him with the necessary paperwork for filing an appeal.

DCFS counters that Father did not file any notice of appeal regarding I.L. that we might be able to deem constructively filed, that Father's bases for applying *Benoit* to these or other proceedings involving termination of parental rights lack merit, and that, in any event, Father has not satisfied the requirements of *Benoit* because he failed to exercise sufficient diligence in pursuing review of the order regarding I.L. (See *In re Benoit*, *supra*, 10 Cal.3d at pp. 88–89 [court should "not indiscriminately permit a defendant whose counsel has undertaken to file the notice of appeal, to invoke the doctrine of constructive filing when the defendant has displayed no diligence in seeing that his attorney has discharged this responsibility"].)

Father's motion raises important policy issues, and we are troubled by the fact that Father appears not to have received basic guidance from his attorney regarding his appellate rights. Nevertheless, Father's motion does not present an opportunity to engage on these policy issues, and no prejudice resulted from Father's inability to appeal the order regarding I.L. This is because Father makes clear that, were we to permit an appeal regarding the I.L. order, Father would raise the exact same arguments that he raised in his appeal regarding Christopher. Given our conclusion, for the reasons discussed above, that Father's arguments regarding Christopher do not merit reversal, permitting Father to extend his

appeal to I.L. would serve no purpose, even assuming this court has the ability and inclination to grant it.  The motion is denied.

## DISPOSITION

The order of the juvenile court terminating Father's parental rights as to Christopher L. on March 5, 2020 is affirmed in all respects.

Father's motion to extend his notice of appeal to apply to I.L. and/or motion for constructive notice of appeal as to I.L. is denied.

<u>CERTIFIED FOR PUBLICATION</u>.


ROTHSCHILD, P. J.

We concur:



CHANEY, J.



BENDIX, J.