Filed 12/17/20  In re D.J. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re D.J. et al., Persons Coming Under the Juvenile Court Law. | B305214<br><br>(Los Angeles County Super. Ct. No. 18CCJP05241A-B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>       Plaintiff and Respondent,<br><br>       v.<br><br>JANELLE B.,<br><br>       Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Philip L. Soto, Judge.  Affirmed.

Judy Weissberg-Ortiz, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent, Los Angeles County Department of Children and Family Services.

* * * * * *

The juvenile court terminated Janelle B.'s (mother's) parental rights over her twin sons, D.J. and R.J. Mother argues that the termination orders are invalid because (1) they violate the Indian Child Welfare Act (ICWA) (25 U.S.C., § 1901 et seq.; Welf. & Inst. Code, § 224 et seq.),[1] and (2) neither mother nor an attorney representing mother were present at the hearing where the termination orders were entered. Neither argument warrants relief on appeal: There is no ICWA error under the new amendments to ICWA, and the presence of mother and/or her counsel would not have changed the outcome of the termination hearing. Accordingly, we affirm the orders.

## FACTS AND PROCEDURAL BACKGROUND

### I.    Facts

Mother and Alfred J. (father) have an "on-again, off-again" relationship that has produced four children: J.J. (born August 2016), A.J. (born July 2017), and twin boys, D.J. and R.J. (born June 2018).

Mother has struggled with drug abuse. At the time of A.J.'s birth, both mother and A.J. tested positive for methamphetamine. Mother tested positive for amphetamines in

---

1    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

April 2018, while six months pregnant with D.J. and R.J. In August 2018, mother possessed what looked to be methamphetamine. Mother nevertheless denies that she has ever used drugs during her pregnancies and, more broadly, "does not feel that she has a problem with drugs."

Mother has also been violent with father. In September 2017, she struck father and cut his lip. Father obtained a domestic violence restraining order against mother. Notwithstanding that order, in September 2018, mother again engaged in an altercation with father and was arrested for violating that order.

At the time of D.J.'s and R.J.'s birth, mother was their sole custodian.

## II. Procedural Background

### A. *This case, involving D.J. and R.J.*

#### 1. *Petitions*

On August 17, 2018, the Los Angeles Department of Children and Family Services (the Department) filed a petition asking the juvenile court to exert dependency jurisdiction over D.J. and R.J. In the operative, First Amended Petition filed on September 21, 2018, the Department alleges that (1) mother has a "history of illicit drug[ use] including methamphetamine and amphetamine," and is a "current user of amphetamine," all of which place D.J. and R.J., due to their "tender age," at "risk of serious physical harm" (thereby warranting the exercise of jurisdiction under subdivision (b)(1) of section 300), and (2) mother and father have "a history [of] engaging in domestic violence" that "places the children at risk of serious physical

3

. . . harm" (thereby also warranting the exercise of jurisdiction under subdivision (b)(1) of section 300).[2]

### 2. *Jurisdiction and reunification*

On October 9, 2018, after mother pled no contest to the two allegations in the operative petition, the juvenile court exerted dependency jurisdiction over D.J. and R.J., removed the twins from mother's custody, and ordered the Department to provide mother with reunification services.

On May 2, 2019, the juvenile court held a six-month progress hearing. By that time, mother had not completed the drug treatment program or domestic violence program that was part of her case plan, and had missed every single drug test except one. On this basis, the court found that mother had made "minimal" progress with her case plan and was thus not in compliance with that plan, and proceeded to terminate her reunification services. The court set a permanency planning hearing for D.J. and R.J. for August 29, 2019.

### 3. *Termination of mother's parental rights over D.J. and R.J.*

On March 10, 2020, the juvenile court found D.J. and R.J. to be adoptable, found that the beneficial parent-child exception did not apply, and terminated mother's parental rights over the twins.

### 4. *Appeal*

Mother filed this timely appeal from the termination orders.

---

[2] Although father was named in the petition, he is not a party to this appeal.

4

**B.** *The parallel case, involving older siblings J.J. and A.J.*

Prior to the birth of D.J. and R.J., the juvenile court had exerted dependency jurisdiction over J.J. and A.J. on the basis of mother's drug use, mother's 2017 physical assault of father, and father's inability to provide J.J. and A.J. with the necessities of life. The parents did not reunify with J.J. and A.J., and the juvenile court terminated mother's parental rights over J.J. and A.J. in February 2019.

## DISCUSSION

### I.    ICWA Violation

#### A.    *Facts pertinent to ICWA*

##### 1.    *Exploration of ICWA status in the parallel case*

On August 2, 2017, and August 9, 2017, respectively, mother and father filled out ICWA-020 forms and indicated that neither parent had "Indian ancestry as far as [they] know."

In September 2017, the Department learned that J.J. and A.J. may qualify as "Indian children" through the maternal grandmother or paternal grandmother. The Department interviewed the maternal grandmother, who stated that *her* mother (that is, J.J.'s and A.J.'s maternal great-grandmother) "had American Indian [ancestry]" through an unknown tribe but was unsure if any member of the family was enrolled in the tribe. The Department also interviewed the paternal grandmother, who stated that (1) *her* mother (that is, J.J.'s and A.J.'s paternal great-grandmother) "ha[d] Apache" heritage, but was not enrolled in the tribe, (2) *her* father (that is, J.J.'s and A.J.'s paternal great-grandfather) had "Indian ancestry" through an unknown tribe but was not registered with that tribe, and (3) *her* great-grandmother's mother (that is, J.J.'s and A.J.'s paternal great-

5

great-great-grandmother) had "Indian ancestry" with an unknown tribe.

The Department thereafter sent notice to all eight Apache tribes to solicit their input as to whether J.J. and A.J. were "Indian children" under ICWA. By March 2018, none of the tribes had responded that J.J. and A.J. qualified as "Indian children."

On that basis, the juvenile court found that ICWA did not apply to J.J. and A.J.

2.    *Exploration of ICWA status in this case*

In late August 2018, mother filled out an ICWA-020 form indicating that she had "no Indian ancestry as far as [she] know[s]." During mother's initial appearance on August 27, 2018, the juvenile court asked if "there [is] any reason to believe that [father] has American Indian heritage," and mother responded that father's "great-grandmother may have some [American Indian] heritage." After the Department reminded the court of its ICWA finding regarding J.J. and A.J. and that they had the same parents as D.J. and R.J., the court found that it had no "reason to know that [D.J. and R.J.]" were "Indian child[ren]" within the meaning of ICWA.

When father made his first appearance in late September 2018, he filled out an ICWA-020 form indicating that he had "no Indian ancestry as far as [he] know[s]."

The juvenile court in this case accordingly found that ICWA was inapplicable, and did not order the Department to provide notice to any Indian tribes.

6

3.    *Termination of parental rights, appeal, and stipulated remand in the parallel case*

In February 2019, the juvenile court in the parallel case terminated mother's parental rights over J.J. and A.J.

Mother appealed.

In September 2019, the Department and mother stipulated to a remand to "ensur[e] ICWA compliance."  Specifically, the parties agreed that the Department would (1) "re-interview" the maternal and paternal grandmothers "to obtain identifying information about the more-remote . . . extended family members *who may have Indian ancestry*," (2) "interview any . . . extended family member who may have information about the family's *possible Indian ancestry*," and (3) send supplemental notices, with any additional information learned, to the Apache tribes. (Italics added.)

**B.    *Analysis***

Mother's primary argument is that the juvenile court's order terminating her parental rights over D.J. and R.J. violates ICWA because the twins have the same parents as J.J. and A.J. and the Department has already stipulated that the order terminating mother's parental rights over those children violated ICWA (or, at a minimum, warranted a remand).[3]  In assessing whether ICWA has been violated, we review any questions of law

_____

[3]    Mother's secondary argument is that the trial court erred in not ordering the Department to speak with the paternal grandmother after mother suggested, at her August 2018 initial appearance, that parental grandmother may have Indian heritage.  This was not error because (1) the Department had already interviewed paternal grandmother in the parallel case, and (2) re-interviewing paternal grandmother was not required by ICWA, for the reasons described in the text.

7

de novo but review the court's ICWA findings for substantial evidence.  (*Dwayne P. v. Superior Court* (2002) 103 Cal.App.4th 247, 254; *In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1430.)

ICWA was enacted to curtail "the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement."  (*Miss. Band of Choctaw Indians v. Holyfield* (1989) 490 U.S. 30, 32.)  Under the ICWA and California statutes our Legislature enacted to implement it (§§ 224-224.6), as amended effective January 1, 2019, a juvenile court—and, as its delegate—the Department— have duties all aimed at assessing whether a child involved in a pending dependency case is an "Indian child" entitled to the special protections of ICWA.  (§§ 224.2, 224.3; Stats. 2018, ch. 833 (Assem. Bill No. 3176); *In re A.M.* (2020) 47 Cal.App.5th 303, 320 [applying ICWA law in effect at time of order terminating parental rights]; *In re Isaiah W.* (2016) 1 Cal.5th 1, 15 [same].) For these purposes, an "Indian child" is a child who (1) is "a member of an Indian tribe," or (2) "is eligible for membership in an Indian tribe *and* is the biological child of a member of an Indian tribe."  (25 U.S.C. § 1903(4), italics added; § 224.1, subd. (a) [adopting federal law definition].)  By its terms, this definition turns "'on the child's political affiliation with a federally recognized Indian Tribe,'" not "necessarily" "the child's race, ancestry or 'blood quantum.'"  (*In re Austin J.* (2020) 47 Cal.App.5th 870, 882 (*Austin J.*), quoting 81 Fed.Reg. 38801- 38802 (June 14, 2016).)

Under ICWA as amended, the Department and juvenile court have "three distinct duties."  (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052 [noting amendment's creation of three duties]; *Austin J.*, *supra*, 47 Cal.App.5th at pp. 883-884 [same].)

8

The first duty is the initial "duty" of the Department and the juvenile court "to inquire whether [a] child is an Indian child." (§ 224.2, subds. (a) & (b).)  The Department discharges this duty chiefly by "asking" family members "whether the child is, or may be, an Indian child."  (*Id.*, subd. (b).)  For its part, the juvenile court is required, "[a]t the first appearance" in a dependency case, to "ask each participant" "present" "whether the participant knows or has reason to know that the child is an Indian child." (*Id.*, subd. (c).)  The second duty is the duty of the Department or the juvenile court to "make further inquiry regarding the possible Indian status of the child."  (§ 224.2, subd. (e).)  This duty is triggered if the Department or court "has reason to believe that an Indian child is involved" (*ibid.*), and, once triggered, obligates the Department to conduct further interviews to gather information, to contact the Bureau of Indian Affairs and state Department of Social Services for assistance, and/or to contact the relevant Indian tribe(s).  (*Ibid.*)  The third duty is the duty to notify the relevant Indian tribe(s).  (§ 224.3, subd. (a); 25 U.S.C. § 1912, subd. (a).)  This duty is triggered if the Department or the court "knows or has reason to know . . . that an Indian child is involved."  (§ 224.3, subd. (a).)  The Department or juvenile court has "reason to know a child involved in a proceeding is an Indian child" in one of six statutorily defined circumstances—namely, when (1) "[a] person having an interest in the child . . . informs the court that the child is an Indian child" (§ 224.2, subd. (d)(1)), (2) "[a]ny participant in the proceeding . . . informs the court that it has discovered information indicating that the child is an Indian child" (*id.*, subd. (d)(3)), (3) "[t]he child . . . gives the court reason to know that the child is an Indian child" (*id.*, subd. (d)(4)), (4) the child or the parents reside, or are domiciled, "on a

reservation or in an Alaskan native village" (*id.*, subd. (d)(2)), (5) "the child is or has been a ward of a tribal court" (*id.*, subd. (d)(5)), or (6) "either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe" (*id.*, subd. (d)(6)).

In her primary argument, mother is effectively arguing that the Department and juvenile court did not properly discharge the last of the two ICWA duties—that is, the duty to conduct further inquiry and the duty to notify the Indian tribes. By statute, however, those duties apply only if there is a "reason to believe" (as to the duty of further inquiry) or a "reason to know" (as to the duty to notify) that the children at issue are Indian children. (§§ 224.2, subd. (e), 224.3, subd. (a).) Substantial evidence supports a finding that there is no reason to believe or reason to know that D.J. and R.J.—or, for that matter, J.J. and A.J.—are Indian children. That is because the information that the Department and the juvenile court possessed established, at best, that the children had Indian "ancestry" or "heritage." That is what the maternal and paternal grandmothers reported, and what the conditional remand in the parallel case was designed to investigate further. But "Indian ancestry, without more, does not provide a reason to believe"— and thus does not provide a "reason to know"—"that a child is a member of a tribe or is the biological child of a member." (*Austin J.*, *supra*, 47 Cal.App.5th at pp. 888-889.) Here, there was nothing more, as the grandmothers both confirmed that none of *their* ancestors were ever members of, or otherwise enrolled in, a federally registered tribe. That the Department for whatever reason opted to stipulate to a remand that was not required by

10

ICWA in the parallel case does not provide *us* any grounds to depart from ICWA's mandates in this case.

## II.    Termination of Parental Rights at Hearing Without Mother or Any Counsel to Represent Her

### A.    *Pertinent facts*

#### 1.    *Regarding appointment of counsel*

At mother's first appearance in this case on August 27, 2018, the juvenile court appointed a lawyer to represent mother.

Approximately one month later, on September 26, 2018, Lawren Cottles (attorney Cottles) substituted in as mother's appointed counsel.  At first, attorney Cottles was associated with the Law Office of Katherine Anderson.  By May 2019, attorney Cottles was associated with the Law Office of Amy Einstein. Attorney Cottles represented mother at the jurisdictional and dispositional hearing, at the six month progress report hearing, at the August 2019 hearing set as the initial permanency planning hearing, and at the January 14, 2020 hearing to which the permanency planning hearing had been rescheduled.

Both attorney Cottles and mother attended the January 14, 2020 hearing.  At that hearing, the trial court again continued the permanency planning hearing, this time to March 10, 2020. Then the court—not once, but twice—personally "ordered" mother to "return" to court for that March 10, 2020 hearing.

On February 28, 2020, Diana Walch—another lawyer associated with the Law Office of Amy Einstein—filed a motion asking for the office to be relieved as mother's counsel due to "an actual conflict" that "can[not] be waived."

The juvenile court heard the motion to be relieved on March 5, 2020.  Although the motion had been served on mother by mail and by e-mail, mother was not present.  The attorney reaffirmed that the firm "ha[s] a conflict," but was "unable to

provide the court with further information." Based on counsel's representation of an unwaivable conflict, the court granted the attorney's motion to be relieved as counsel and appointed a different panel attorney, a "Ms. Sweet" (attorney Sweet), to represent mother. When attorney Sweet told the court that she could not accept the appointment until mother was present, the court ordered attorney Sweet to contact mother so that both mother and attorney Sweet would be up to speed for the previously scheduled March 10 permanency planning hearing.

Mother did not show up for the March 10, 2020 permanency planning hearing despite attorney Sweet's efforts to contact mother. Attorney Sweet reaffirmed that she could not accept appointment unless mother was present. After recounting that it had personally ordered mother to appear for the March 10 hearing, the juvenile court found that mother had been "given proper notice" and stated that it was "ready to proceed." The court then found D.J. and R.J. to be adoptable, found that the beneficial parent-child bond exception did not apply, and terminated mother's parental rights over D.J. and R.J.

        2.     *Regarding the beneficial parent-child relationship exception*

D.J. and R.J. were removed from mother and placed with Ms. E. (foster mother) on August 15, 2018, when they were six and one-half weeks old.

Between August 2018 and March 2019, mother's visits with the children were "sporadic." Between June and August 2019, mother made "almost weekly" visits with the children at a food court at the Ontario Mills mall. Between August 2019 and November 2019, mother's visits again became "sporadic." The visits stopped entirely in November 2019. All of mother's visits were monitored. During the visits, mother was "affectionate and

loving," but always "appear[ed] to be overwhelmed with their care." The twins did not "seem to have a bond with mother."

With foster mother, by contrast, the twins had a "loving, consistent routine" and were "thriv[ing] and do[ing] well." The twins had "both attached" to foster mother and had "established" "a normal parent-child relationship."

Foster mother repeatedly affirmed her desire to adopt D.J. and R.J.

In early 2020, mother reported that she had been "working full time" and "attending school," although she offered no documentation in support of her reports.

### B. *Analysis*

Mother argues that the juvenile court erred in terminating her parental rights at a hearing where neither she nor any attorney representing her was present. We agree with mother that this is procedurally problematic. We note, however, that the genesis of these procedural problems is mother: If mother had shown up to the March 10, 2020 hearing, as the juvenile court had personally ordered her to do, then mother's previously designated replacement counsel (that is, attorney Sweet) could have accepted the court's appointment, such that both mother *and* her new lawyer either (1) would have been present for the permanency planning hearing, or (2) could have requested a continuance of that hearing. Even if we ignore mother's central role in creating the procedural morass of which she now complains, her absence—and that of any counsel—does not entitle to her relief from the court's termination order.

A parent's right to counsel at the permanency planning stage—that is, after the juvenile court has exerted jurisdiction and terminated any reunification services—is grounded in

13

statute, not in the federal or California Constitution. (§ 317, subds. (b) & (d); Cal. Rules of Court, rule 5.534, subds. (c) & (d); *In re Andrew S.* (1994) 27 Cal.App.4th 541, 548-549 [holding that there is no "constitutional right to appointed counsel" at a "366.26," permanency planning hearing]; cf. *In re Ronald R.* (1995) 37 Cal.App.4th 1186, 1195 (*Ronald R.*) [holding that there is a due process-based right to counsel when reunification services are terminated].) As such, the denial of counsel will not mandate reversal on appeal unless mother "demonstrate[s] a reasonable probability that a more favorable result "'would have been reached'"" had counsel been appointed. (*In re J.P.* (2017) 15 Cal.App.5th 789, 797-798 (*J.P.*), citations omitted; *Ronald R.*, at p. 1195; *In re A.J.* (2019) 44 Cal.App.5th 652, 665-666 (*A.J.*).) This inquiry into whether the absence of counsel was prejudicial is to be evaluated on a "case-by-case" basis, and with special focus on the "effect" of counsel's absence "on the best interests of the child[ren]." (*J.P.*, at p. 799.)

Mother has not carried her burden of showing that it is "reasonably probable" that, had she or a lawyer for her been present, the result of the permanency planning hearing would have been more favorable to mother. Mother does not dispute that D.J. and R.J. were adoptable or that their adoptability obligated the juvenile court to terminate her parental rights and order adoption unless mother proved that one of the six statutory exceptions applied. (§ 366.26, subds. (c)(1) & (c)(1)(B); *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527, overruled in part on other grounds as stated in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010.) The only relevant exception is the beneficial parent-child relationship.

14

The beneficial parent-child relationship exception applies when (1) "the parent[] ha[s] maintained regular visitation and contact with the child[ren]," and (2) "the child[ren] would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) Because "'[i]nteraction between [a] natural parent and child[ren] will always confer some incidental benefit to the child[ren],'" the second element of the exception requires a parent to show that (1) "she occupies a parental role in the child[ren]'s life, resulting in a significant, positive, emotional attachment between child[ren] and parent," and (2) "the child[ren] would suffer detriment if [their] . . . relationship with the parent were terminated." (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.) In assessing whether termination of parental rights would be detrimental to a child, courts look to "(1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467.)

It is not reasonably probable that the juvenile court would have found the beneficial parent-child relationship exception applicable even if mother had been present at the permanency planning hearing with a lawyer. That is because the record unequivocally demonstrates that mother satisfied *none* of the exception's prerequisites. Mother did not "maintain[] regular visitation and contact with" D.J. and R.J. Except for a brief, two-or-three-month period over the summer of 2019, mother's visits with the twins were either "sporadic" or nonexistent. This precludes a finding of regular visitation. (*In re I.R.* (2014) 226 Cal.App.4th 201, 212 ["significant lapses in visits" preclude a finding of "regular visit[s]"]; *In re Anthony B.* (2015) 239

15

Cal.App.4th 389, 396 ["'Sporadic visitation is insufficient to satisfy the first prong of the parent-child relationship exception to adoption'"].) Mother also cannot show that the twins "would benefit from continuing the relationship" because mother never occupied a "parental role" vis-à-vis the twins and the twins would not suffer detriment if their relationship with mother were terminated. The twins have lived with foster mother all but six-plus weeks of their entire lives, and mother's sole interaction with them has been in monitored visits where she has appeared to be "overwhelmed" taking care of them; at no point has mother occupied a parental role. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 ["a parental relationship is necessary for the [beneficial relationship] exception to apply"], italics omitted.) The twins would also not suffer detriment if adopted by foster mother (with whom they had "established" "a normal parent-child relationship") rather than placed with mother (with whom they had no apparent bond).

Mother offers three sets of arguments in response.

First, she argues that the juvenile court's termination of her parental rights without her or any attorney representing her violated due process. To be sure, a parent may have a "due process right to counsel during [parental] termination proceedings" "on a case-by-case basis" even when, as a general matter, the right to counsel is otherwise grounded in statute. (*Ronald R.*, *supra*, 37 Cal.App.4th at pp. 1195-1196.) But the existence of this case-by-case right turns on "whether the presence of counsel would have made a 'determinative difference' in the outcome of the proceeding," thereby rendering the proceedings "fundamentally unfair." (*Id.* at pp. 1196-1197; *In re Claudia S.* (2005) 131 Cal.App.4th 236, 251; *In re Malcolm D.*

16

(1996) 42 Cal.App.4th 904, 921 (*Malcolm D.*).) Because the only disputed issue at mother's permanency planning hearing was the applicability of the beneficial parent-child relationship exception and because, as explained above, that exception was foreclosed by the record, the presence of counsel would not have made *any* difference—let alone the "determinative difference" required to make out a violation of due process.

Second, mother contends that a different ruling on the beneficial parent-child relationship exception was reasonably probable had counsel been present because (1) as mother's counsel proffered at the January 2020 hearing, mother would have testified that she was in school and employed, and the juvenile court found this proffer so compelling that it ordered the Department to investigate it, and (2) an attorney would have aided mother in presenting witnesses[4] and other documents. Accepting the contents of mother's proffer as true—namely, that she was busy with school and work, and that these other activities made it difficult to visit the children—would do nothing to change the court's analysis of the beneficial parent-child relationship exception because these additional facts do not negate the fact that mother's visitation was sporadic or nonexistent, that mother did not occupy a parental role, or that mother did not have any bond as compared with foster mother's bond. And the court ordered the Department to investigate further to see whether "there's evidence to support *or contradict* mother" (italics added), not because the court felt it was a close

_____

[4] We note that attorney Cottles informed the court at the January 14, 2020 hearing that she was not requesting that any social workers be made available for examination at the section 366.26 hearing.

17

case. While it is possible that counsel would have aided mother generally (*J.P.*, *supra*, 15 Cal.App.5th at p. 801), the fact that "counsel"—with her legal training and acumen—"*could* have made a difference" does not establish a reasonable probability that counsel *would* have made a difference, particularly where the evidence in the record precluded application of the beneficial parent-child relationship exception. (*Malcolm D.*, *supra*, 42 Cal.App.4th at p. 921.)

Lastly, mother cites four cases that she contends dictate a ruling in her favor. They do not. Mother cites *In re Dolly D.* (1995) 41 Cal.App.4th 440 (*Dolly D.*), but that case involved a juvenile court's refusal to allow a parent's lawyer to cross-examine a witness on the ground that the parent had elected not to attend the hearing (*id.* at pp. 443-446); here, the court appointed counsel and was ready to allow counsel to participate in the hearing. *Dolly D.* also preceded *In re Celine R.* (2003) 31 Cal.4th 45, 59-60, where our Supreme Court established that the "reasonable probability" test for prejudice applied in dependency cases. Mother cites *In re Julian L.* (1998) 67 Cal.App.4th 204, but the juvenile court in that case waited three months before appointing replacement counsel for a parent (*id.* at pp. 207-208); here, the court immediately appointed counsel and it was mother's refusal to appear as ordered that precluded appointed counsel from accepting that appointment. Mother cites *J.P.*, *supra*, 15 Cal.App.5th 789, but that case involved the absence of counsel at a hearing to modify a prior order, which had been set for hearing after the trial court had determined that that evidence "strongly favored" the parent's position in the motion to modify, which rendered the absence of counsel prejudicial (*id.* at pp. 800-801); here, the sole issue at the permanency planning

hearing was the applicability of the beneficial parent-child relationship exception, which the record all but foreclosed. And mother cites *A.J.*, *supra*, 44 Cal.App.5th 652, but that case involved a juvenile court that would not re-open its jurisdictional and dispositional orders that were entered at hearings for which father received invalid notice and was not represented (*id.* at pp. 655-656); here, mother had counsel throughout the proceedings until the final permanency planning hearing, where there is no across-the-board constitutional right to counsel.

## DISPOSITION

The orders are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
HOFFSTADT


We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
CHAVEZ

19